NORMAN PELLETIER ET AL. *v.* SORDONI/SKANSKA
CONSTRUCTION COMPANY
(SC 16743)
(SC 16747)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.

Argued September 11, 2002—officially released February 11, 2003*

* Following reconsideration by this court, this opinion has been superseded. See *Pelletier* v. *Sordoni/Skanska Construction Co.*, 264 Conn. 509, 825 A.2d 72 (2003).

*William H. Clendenen, Jr.*, with whom were *Nancy L. Walker* and, on the brief, *Kevin C. Shea,* for the appellants in both appeals (plaintiffs).

*Joseph B. Burns*, with whom was *Zisca R. Burkley*, for the appellee in Docket No. SC 16743 (defendant).

*Anthony J. Natale*, with whom were *Michael A. Fusco* and, on the brief, *Richard F. Wareing*, for the appellee in Docket No. SC 16747 (defendant Professional Services Industries, Inc.).

*Opinion*

BORDEN, J. In these two consolidated appeals, the plaintiff, Norman Pelletier, and his wife, Reine Pelletier,[1] appeal from the summary judgment of the trial court,[2] rendered in favor of the defendants, Sordoni/Skanska Construction Company (Sordoni) and Professional Services Industries, Inc. (Professional Services).[3]

---

[1] The claims of Reine Pelletier are solely for loss of consortium. Because those claims are derivative of the claims of Norman Pelletier, we refer to Norman Pelletier as the plaintiff.

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The plaintiff's action originally was brought against Sordoni. Thereafter, the trial court granted the plaintiff's motion to cite in Professional Services as a party defendant.

The plaintiff claims that the trial court improperly determined that neither Sordoni nor Professional Services could be held liable to the plaintiff for alleged negligence. We affirm the judgment of the trial court.

The following procedural history is relevant to our resolution of these appeals. In his complaint, the plaintiff alleged negligence as to both Sordoni and Professional Services, and breach of contract as to Sordoni alone. Both defendants moved for summary judgment. Sordoni argued that, pursuant to the rule set forth by the Appellate Court in *Ray* v. *Schneider*, 16 Conn. App. 660, 548 A.2d 461, cert. denied, 209 Conn. 822, 551 A.2d 756 (1988), it could not be held liable in negligence to the employee of its independent subcontractor. Sordoni also argued that the contract that was alleged in count two of the plaintiff's complaint did not exist. Professional Services argued that it did not owe a duty to the plaintiff under its subcontract with Sordoni. The trial court granted both motions for summary judgment and rendered judgment for the defendants accordingly. These appeals followed.

The parties presented the following undisputed facts to the trial court on the motions for summary judgment. At the time of the incident giving rise to this action, Sordoni was the general contractor for the "Pitney Bowes Project," a building under construction for a large shipping company, Pitney Bowes, Inc. (Pitney Bowes). The plaintiff was an employee of Berlin Steel Construction Company (Berlin Steel), the structural steel fabrication and erection subcontractor for the project. Sordoni hired Professional Services to inspect the work performed by Berlin Steel.

Under its subcontract with Sordoni, Berlin Steel had the responsibility to provide all of the structural steel for the Pitney Bowes project, and to ensure its integrity. This included the duty to weld connections in the struc-

tural steel that would allow for the interconnection of steel members as a load-bearing, structural frame for the building. Furthermore, Berlin Steel had the duty to inspect those welds, ensuring their ability to bear weight. Under its contract with Berlin Steel, Sordoni reserved the right to inspect the structural steel, "solely for [its own] benefit." The contractual documents emphasized that Sordoni's "[i]nspection and acceptance, or failure to inspect, shall in no way relieve [Berlin Steel] from [its] responsibility to furnish satisfactory material strictly in accordance with the [c]ontract [d]ocuments."

On June 20, 1994, the plaintiff suffered serious physical injuries in an accident at the Pitney Bowes construction site. At the time of the accident, he was working beneath the building's large steel frame, which his employer, Berlin Steel, had been hired to build. The plaintiff was in the process of installing metal sheet flooring between two steel columns when several of his coworkers interrupted his work to install a two ton crossbeam between the columns. The plaintiff stepped away while his coworkers bolted the crossbeam to seat connections, which are steel flanges that enable the interconnection of large structural members, located on each of the columns. One of the seat connections, on column 313, had been only tack welded to the column. A tack weld is a weak, provisional weld, which is intended only to hold a piece in place pending a full, load-bearing weld. The tack weld on column 313 did not immediately give way under the one ton load of the crossbeam. After his coworkers secured the crossbeam to the seat connections on the columns, the plaintiff returned to work beneath the crossbeam. Within minutes, the seat connection broke and the corresponding end of the crossbeam fell, striking him. The plaintiff suffered severe injuries and is currently recovering workers' compensation benefits from Berlin Steel for his injuries.

Further facts and procedural history will be set forth where necessary.

We first set forth the standards of review applicable to both of these appeals. Each appeal arises from a judgment of the trial court granting a motion for summary judgment. "[T]he standard of review of a trial court's decision to grant a motion for summary judgment is well established. Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Elliott* v. *Waterbury*, 245 Conn. 385, 391, 715 A.2d 27 (1998). With this standard of review in mind, we turn to the plaintiff's claims on appeal.

## I

## THE PLAINTIFF'S CLAIMS AGAINST SORDONI

In his appeal against Sordoni, the plaintiff claims that the trial court improperly determined that: (1) the general contractor nonliability rule set forth in *Ray* v. *Schneider*, supra, 16 Conn. App. 663–65, barred recovery under count one of his complaint, which sounded in negligence; and (2) neither Sordoni's contract with Pitney Bowes nor an orientation and procedures manual that Sordoni had distributed to the plaintiff created a duty to the plaintiff.[4] We disagree.

---

[4] Although the plaintiff also argues on appeal that the trial court improperly determined disputed issues of causation in his case against Sordoni, there is no support in the record for this argument. The plaintiff focuses on one phrase in the trial court's memorandum of decision, which reads as follows: "The undisputed facts indicate that the direct cause of the accident in this case was the combined failure of the plaintiff's employer, Berlin Steel, to provide the structural steel framework called for by the contract drawings and specifications, in addition to its failure to inspect its work in the manner

The plaintiff's complaint against Sordoni was based on allegations of both negligence and breach of contract. The plaintiff's allegations of negligence were based on a range of legal duties, with statutory and public policy sources. More specifically, the plaintiff alleged that Sordoni "knew or in the exercise of reasonable care . . . should have known" that the job site was unsafe, and failed to abate the danger of the defective weld. The plaintiff alleged further that Sordoni had a duty to inspect the structural steel, including "all main stress carrying elements, welding material and bolting material . . . all steel welds . . . [and] the steel frame of the column upon which the seat angle connection collapsed," yet Sordoni failed to do so in violation of the state building code. Regs., Conn. State Agencies § 29-252-1a. In the breach of contract count, the plaintiff alleged that Sordoni had entered into a contract with the plaintiff, as evidenced by the orientation and procedures manual that Sordoni had required the plaintiff to sign prior to commencing work for Berlin Steel on the project.

In its motion for summary judgment, Sordoni argued that, as a matter of law, with respect to the negligence count, Sordoni, as a general contractor, could not be

required by the Sordoni-Berlin Steel subcontract." That phrase is not a "tacit" determination, as the plaintiff suggests, of disputed factual issues with respect to the element of proximate cause. The trial court was simply stating, as we discuss further in this opinion, that the party primarily responsible, as a matter of public policy, was Berlin Steel, thus counseling toward recognition of the applicability of the nonliability rule in *Ray*. The surrounding context of the phrase in question is devoted to that argument, not disputed issues of proximate causation.

In the present appeal, the plaintiff also relies on Sordoni's contract with Berlin Steel as a source of a contractual duty to the plaintiff. As we indicate later in this opinion, however, in the summary judgment proceedings in the trial court, the plaintiff did not rely on that contract. We confine our consideration, therefore, to those contractual sources presented to the trial court, namely, the Pitney Bowes contract and the orientation and procedures manual.

held liable to the plaintiff, an employee of Sordoni's subcontractor, and that this issue was controlled by *Ray* v. *Schneider*, supra, 16 Conn. App. 660. With respect to the breach of contract claim, Sordoni argued that the orientation and procedures manual did not create any contractual obligations to the plaintiff, but served only as an "acknowledgement that . . . [the plaintiff] had reviewed the rules and regulations contained therein, and that his compliance therewith was required in order to work on the [p]roject." In opposition, the plaintiff argued that *Ray* was not controlling, and that the court should recognize a duty of Sordoni to the plaintiff as a matter of public policy. As "significant" to "evaluating the imposition of a legal duty upon [Sordoni]," the plaintiff quoted a provision of the orientation and procedures manual and several provisions of a contract between Sordoni and Pitney Bowes, which stated that Sordoni would manage the project and take "full responsibility for all safety measures . . . related to the [w]ork . . . ." The plaintiff did not argue that the state building code, or any other regulatory or statutory provisions, provided a basis for holding Sordoni liable in negligence, despite his citation to the building code in his complaint.[5]

As to the breach of contract count, the plaintiff argued that there were two contractual sources of Sordoni's duty to the plaintiff: (1) Sordoni's contract with Pitney Bowes; and (2) the orientation and procedures manual.

The trial court ruled that the rule of nonliability established in *Ray* barred the plaintiff's negligence claim. As

---

[5] We ordinarily decide an appeal on the basis on which the case was litigated in the trial court. *Imperial Casualty & Indemnity Co.* v. *State*, 246 Conn. 313, 320, 714 A.2d 1230 (1998). Therefore, we do not consider the plaintiff's claims on appeal that the state building code, or any other statutory or regulatory source, provides a basis for a legal duty of Sordoni. We consider only the alleged sources of a legal duty that were litigated before the trial court, namely, common-law negligence and the alleged contractual sources.

to the plaintiff's contractual claim, the court ruled that: (1) Sordoni's obligations under its contract with Pitney Bowes were solely for the benefit of Pitney Bowes, and that the plaintiff was not a third party beneficiary of that contract; and (2) the orientation and procedures manual simply set forth general obligations by all involved in the project to provide a safe workplace, and that it did not create an exception to the nonliability rule established in *Ray*. Accordingly, the trial court granted Sordoni's motion for summary judgment. This appeal followed.

### A

The plaintiff claims that the trial court improperly determined that the general contractor nonliability rule set forth in *Ray* v. *Schneider*, supra, 16 Conn. App. 663–65, barred recovery under count one of his complaint, which sounded in negligence. We conclude that the reasoning of the Appellate Court in *Ray* is sound, and bars the plaintiff's negligence count against Sordoni in the present case because the plaintiff was the employee of Sordoni's independent ˙subcontractor, which was primarily responsible for the safety of steel fabrication.

As a general rule, "an employer is not liable for the negligence of its independent contractors. *Douglass* v. *Peck & Lines Co.*, 89 Conn. 622, 627, 95 A. 22 (1915); W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 71, p. 509; 41 Am. Jur. 2d, Independent Contractors § 29 (1995)." *Gazo* v. *Stamford*, 255 Conn. 245, 256–57, 765 A.2d 505 (2001); *Alexander* v. *R.A. Sherman's Sons Co.*, 86 Conn. 292, 299, 85 A. 514 (1912); 2 Restatement (Second), Torts § 409, p. 370 (1965). "The explanation for [this rule] most commonly given is that, since the employer has no power of control over the manner in which the work is to be done by the contractor, it is to be regarded as the contractor's own enterprise, and

[the contractor], rather than the employer, is the proper party to be charged with the responsibility of preventing the risk, and bearing and distributing it." 2 Restatement (Second), supra, § 409, comment (b).

This same rule applies, as a general matter, to general contractors, as employers of independent subcontractors: a general contractor is not liable for the torts of its independent subcontractors. There are, however, certain exceptions to this rule. For example, where the general contractor, itself, breaches a duty of care, such as a duty "to exercise reasonable care in inspecting the work after it is done or, in certain cases, during its progress, in order to see that the work is so done as to secure the safety of others" the general contractor may be liable in negligence, notwithstanding the general rule of nonliability. Id., § 409, introductory note, p. 371; see id., § 412; see generally id., § 410 et seq.[6] Such exceptions to the nonliability rule apply in the case of innocent third parties. The question presented by the present case is whether the exceptions to the general rule of nonliability of a general contractor for the torts of its independent contractor inure to the benefit of an employee of the independent contractor, such as the plaintiff here. We conclude that those exceptions do not inure to the plaintiff's benefit.

We first consider the significance of *Ray* v. *Schneider*, supra, 16 Conn. App. 660, which the trial court found

---

[6] We do not give an exhaustive list of the possible duties of care that may provide an exception to the rule of nonliability, leading to a general contractor's liability. The Restatement (Second) of Torts gives, inter alia, the following additional examples. A general contractor might also be held liable, notwithstanding the general rule of nonliability, where the work in question poses "a peculiar unreasonable risk of physical harm to others unless special precautions are taken" and the general contractor "fails to provide in the contract that the contractor shall take such precautions" or "fails to exercise reasonable care" itself. 2 Restatement (Second), supra, § 413. Also, a general contractor that retains control of the work performed by the subcontractor might be liable for a "failure to exercise [that] control with reasonable care." Id., § 414.

dispositive in rendering summary judgment for Sordoni. In *Ray*, the Appellate Court faced a similar fact pattern. The plaintiff in *Ray* was also an employee of a subcontractor for a large building construction project. Id., 662. The defendants in *Ray* had hired the subcontractor "to excavate a trench and to install sewer, water and gas utility pipelines . . . ." Id. The plaintiff alleged that the trench collapsed around him and severely injured him as a result of the subcontractor's negligence, and sought to hold the defendants, who were owners, lessees or developers of the project, liable under two theories: (1) that they should be held vicariously liable, i.e., liable despite an absence of fault on their own part; *Alvarez* v. *New Haven Register, Inc.*, 249 Conn. 709, 720, 735 A.2d 306 (1999);[7] for the negligence of the subcontractor; *Ray* v. *Schneider*, supra, 663–64; and (2) that they should be held directly liable for negligently hiring the subcontractor. Id., 671–72.

The court in *Ray* rejected both claims. The court in *Ray* first gave its reasoning in support of the denial of liability under the vicarious liability claim; id., 663–70; and then also rejected the claim of direct liability for negligent hiring for essentially the same reasons as given for rejecting the vicarious liability theory. Id., 672. Although in the present case the claim of direct liability for the failure to inspect properly the work of the subcontractor is a different form of negligence than that asserted in *Ray*, we see no reason to distinguish the

---

[7] "Vicarious liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of [another]. Its true basis is largely one of public or social policy under which it has been determined that, *irrespective of fault*, a party should be held to respond for the acts of another." (Emphasis added; internal quotation marks omitted.) *Alvarez* v. *New Haven Register, Inc.*, supra, 249 Conn. 720. Thus, an allegation of vicarious liability does not involve the breach of any duty by the party vicariously liable.

results based on the type of negligence asserted. Thus, the issue in the present case is the same as that presented in *Ray*: whether the plaintiff, who was an employee of Berlin Steel, which was the independent subcontractor employed by Sordoni, may recover in a direct action against Sordoni based on allegations of direct negligence by Sordoni. The reasoning of *Ray* persuades us that he may not.

First, the law, in the form of the workers' compensation statutes, already provides the plaintiff with a level of compensation for his injuries. Therefore, there is not the same social need to compensate him from a different source of liability that there is in the case of the ordinary third party, such as an innocent bystander. Id., 667–68. Bystanders have no stake in the construction operation, nor any means of recovery through workers' compensation. An employee of the subcontractor, by contrast, has access to workers' compensation benefits and "has specifically contracted to perform such work knowing the risks involved . . . ." Id., 667.

Second, as the Appellate Court indicated in *Ray*, the weight of authority is against the plaintiff's claim here.[8]

[8] "See, e.g., *Scofi* v. *McKeon Construction Co.*, 666 F.2d 170 (5th Cir. 1982); *Evans* v. *Transportacion Maritime Mexicana*, 639 F.2d 848 (2d Cir. 1981); *Vagle* v. *Pickands Mather & Co.*, 611 F.2d 1212 (8th Cir. 1979), cert. denied, 444 U.S. 1033, 100 S. Ct. 704, 62 L. Ed. 2d 669 (1980) (applying Minnesota law); *Bramer* v. *United States*, 595 F.2d 1141 (9th Cir. 1979); *Chavis* v. *Finnlines Ltd., O/Y*, 576 F.2d 1072 (4th Cir. 1978); *Jones* v. *United States*, 399 F.2d 936 (2d Cir. 1968); *Lipka* v. *United States*, 369 F.2d 288 (2d Cir. 1966), cert. denied, 387 U.S. 935, 87 S. Ct. 2061, 18 L. Ed. 2d 997 (1967); *Galbraith* v. *United States*, 296 F.2d 631 (2d Cir. 1961); *Wallach* v. *United States*, 291 F.2d 69 (2d Cir.), cert. denied, 368 U.S. 935, 82 S. Ct. 373, 7 L. Ed. 2d 197 (1961); *Hurst* v. *Gulf Oil Corporation*, 251 F.2d 836 (5th Cir. 1958); *Ackerman* v. *Gulf Oil Corporation*, 555 F. Sup. 93 (D.N.D. 1982) (applying North Dakota law); *Sloane* v. *Atlantic Richfield Co.*, 552 P.2d 157 (Alaska 1976); *Welker* v. *Kennecott Copper Co.*, 1 Ariz. App. 395, 403 P.2d 330 (1965); *Jackson* v. *Petit Jean Electric Corporation*, 270 Ark. 506, 606 S.W.2d 66 (1980); *Florida Power & Light Co.* v. *Price*, 170 So. 2d 293 (Fla. 1964); *Pearson* v. *Harris*, 449 So. 2d 339 (Fla. App. 1984); *Peone* v. *Regulus*

Third, as *Ray* points out, the economic relation between the general contractor and its subcontractor is generally such that the contract price indirectly reflects the cost of the workers' compensation insurance paid by the subcontractor, and imposing liability on the general contractor would be, in effect, charging it twice for the same injury. In the words of the court in *Ray*: "It is to be expected that the cost of workers' compensation insurance will be included by the contractor in his contract price for undertaking to perform the inherently dangerous work and, therefore, will ultimately be financed by the employer who hires the independent contractor. . . . The employer thus already furnishes funds, at least in part, to pay the insurance premiums of the independent contractor for workers' compensation. To hold the employer of the contractor liable . . . to the employee of the contractor would effectively make the employer pay twice for a contractor's employee's work-related injury." (Citation omitted.) Id., 668.

Fourth, recognizing the plaintiff's negligence claim against Sordoni would impose a greater liability against

*Stud Mills, Inc.*, 113 Idaho 374, 744 P.2d 102 (1987); *Texas Eastern Transmission Corporation* v. *Seymour National Bank*, 451 N.E.2d 698 (Ind. App. 1983); *Johns* v. *New York Blower Co.*, 442 N.E.2d 382 (Ind. App. 1982); *King* v. *Shelby Rural Electric Co-Op Corporation*, 502 S.W.2d 659 (Ky.), cert. denied, 417 U.S. 932, 94 S. Ct. 2644, 41 L. Ed. 2d 235 (1974); *Vertentes* v. *Barletta Co.*, 392 Mass. 165, 466 N.E.2d 500 (1984); *Sierra Pacific Power Co.* v. *Rinehart*, 99 Nev. 557, 665 P.2d 270 (1983); *Cooper* v. *Metropolitan Government*, 628 S.W.2d 30 (Tenn. App. 1981); *Humphreys* v. *Texas Power & Light Co.*, 427 S.W.2d 324 (Tex. App. 1968); *Humble Oil & Refining Co.* v. *Bell*, 180 S.W.2d 970 (Tex. App. 1944); *Epperly* v. *Seattle*, 65 Wash. 2d 777, 399 P.2d 591 (1965); *Jones* v. *Chevron U.S.A., Inc.*, 718 P.2d 890 (Wyo. 1986); see also annot., 34 A.L.R.4th 914, 934–48, and cases cited therein; note, 'Liability to Employees of Independent Contractors Engaged in Inherently Dangerous Work: A Workable Workers' Compensation Proposal,' 48 Fordham L. Rev. 1165 (1980); contra *Rooney* v. *United States*, 634 F.2d 1238 (9th Cir. 1980) (applying California law); *Van Arsdale* v. *Hollinger*, 68 Cal. 2d 245, 437 P.2d 508, 66 Cal. Rptr. 20 (1968)." *Ray* v. *Schneider*, supra, 16 Conn. App. 665–66.

it than if it had undertaken to do the steel fabrication itself, and would thereby create a disincentive to general contractors to employ more expert subcontractors. As the court in *Ray* noted, "public policy encourages real estate developers and other employers to hire independent contractors where work is inherently dangerous because of their expertise, skill and ability to understand the dangers and to best take safety precautions against them." Id., 670. The imposition of "more liability than if [the general contractor] undertook the work [itself], can only discourage an employer from seeking qualified contractors to perform dangerous work." Id.

Fifth, in the present case, the contract documents make unmistakably clear that the plaintiff's employer, Berlin Steel, was primarily responsible for proper steel fabrication and inspection. Thus, if there was a failure, it was primarily that of Berlin Steel, which is paying the plaintiff workers' compensation benefits, and only secondarily, if at all, that of Sordoni. If the plaintiff were able to recover against Sordoni, Berlin Steel would be entitled to intervene in the plaintiff's action and recoup from the plaintiff's recovery all of its workers' compensation payments. See General Statutes § 31-293. Thus, affording the plaintiff a right to recover in the present case would, in effect, shift the loss from Berlin Steel, the party primarily responsible for the plaintiff's injuries, to Sordoni, the party only secondarily responsible therefor. That would not be a wise and reasonable public policy.

B

The plaintiff claims that the trial court improperly determined that neither Sordoni's contract with Pitney Bowes nor the orientation and procedures manual created a duty of Sordoni to the plaintiff. We conclude that the trial court properly found that the plaintiff was

not a third party beneficiary of Sordoni's contract with Pitney Bowes, and, thus, that Sordoni did not owe the plaintiff a duty by virtue of that contract. We further conclude that the orientation and procedures manual did not represent a contract between Sordoni and the plaintiff.

First, the plaintiff argues that Sordoni's contract with Pitney Bowes created a duty of Sordoni to the plaintiff. Specifically, the plaintiff argues that certain provisions of that contract "charged Sordoni with . . . safety and inspection responsibilities for the . . . purpose of preventing the type of harm suffered by [the plaintiff]." The plaintiff was not a contracting party of this agreement. Thus, his claim that the contract provides a legal duty proceeds under a third party beneficiary theory.[9] We agree with the trial court that this contract did not create third party beneficiary rights in the plaintiff.

"[T]he ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the [mutual] intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary] and . . . that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making . . . ." (Internal quotation marks omitted.) *Grigerik* v. *Sharpe*, 247 Conn. 293, 311–12, 721 A.2d 526 (1998). All of the evidence relevant to the contracting parties' mutual intent indicates that the "safety and inspection" obligations referenced by the plaintiff were intended only to benefit Pitney Bowes. Throughout the written agreement, the parties articu-

[9] The plaintiff also argued that Sordoni owed a duty "to perform its . . . contractual obligations with due care" as a matter of "foreseeability and public policy." This specific argument is controlled by the general contractor nonliability rule, discussed previously, which is applicable to all of the plaintiff's allegations that a duty of Sordoni should be recognized as a matter of public policy.

lated their intent that Sordoni be able to delegate duties, including safety and inspection duties, to subcontractors, such as the plaintiff's employer. The sole concern of these "safety and inspection" provisions was that, between Sordoni and Pitney Bowes, Sordoni would be the responsible party and "hold harmless the [o]wner with respect to [such responsibilities]." The common-sense interpretation of these provisions is that the parties were not concerned with creating legal duties of Sordoni *to subcontractors and their employees.* Although, as the plaintiff argues, employees of a subcontractor working on the project site are *foreseeable* beneficiaries of any safety measures Sordoni might adopt in performing the contract, foreseeability alone is insufficient to create third party beneficiary rights. *Gazo* v. *Stamford,* supra, 255 Conn. 267.

The plaintiff argues that "the trial court essentially ignored the [orientation and] procedures manual, a contract in which Sordoni expressly promised to provide a safe workplace and be responsible for the well-being of all subcontractors' employees, including [the plaintiff]." As summarized previously, the trial court did not ignore the plaintiff's claim that the orientation and procedures manual represented a contract between Sordoni and the plaintiff. The trial court addressed this claim in its memorandum of decision, stating: "The [plaintiff's] contractual claim . . . relies on the force and effect of the manual, the provisions of which cannot be distinguished from the general obligation by all involved in the project to provide and maintain a safe workplace on the owner's property." Thus, the court *did* address this claim, and resolved it against the plaintiff.

After reviewing the purported contractual document in light of the undisputed facts of the case, we agree with the trial court that Sordoni was entitled to judgment on this count. There is nothing in the orientation and procedures manual, or in the entire record, to suggest

that the manual represented a contract by which Sordoni assumed legal duties to employees of Berlin Steel, such as the plaintiff. The plaintiff's argument to the contrary is not a reasonable interpretation of the manual. The undisputed surrounding circumstances, and the manual itself, indicate that the manual was an informational tool designed to educate the plaintiff in the protocols for the job site, not a legally binding contract. The plaintiff was required to read the manual and verify by signature that he understood its principles prior to his admission onto the work site. The language of the manual quoted by the plaintiff itself, even taken out of context, is informational rather than promissory in nature. It provides in relevant part: "[Sordoni] has been charged with the responsibility of constructing this project in a safe, efficient and timely manner. . . ." This language alludes to a preexisting duty "charged" by another party; it does not suggest a new undertaking by virtue of the manual itself. "The law does not make a contract when the parties intend none . . . ." (Internal quotation marks omitted.) *New Haven Tile & Floor Covering Co.* v. *Roman*, 137 Conn. 462, 464, 78 A.2d 336 (1951). Sordoni was entitled to judgment as a matter of law that the orientation and procedures manual did not create the contractual duties alleged.

## II

### THE PLAINTIFF'S CLAIM AGAINST PROFESSIONAL SERVICES

In his appeal from the trial court's judgment in favor of Professional Services, the plaintiff claims that the court improperly concluded that no issue of material fact remained as to whether Professional Services was negligent in performing its contractual duty to inspect the welds on the project.[10] We disagree.

[10] Additionally, the plaintiff relies on the Appellate Court's decision in *Gould* v. *Mellick & Sexton*, 66 Conn. App. 542, 555, 785 A.2d 265, cert. granted, 259 Conn. 902, 789 A.2d 990 (2001), to argue that summary judgment is "an inappropriate way to conclude complex litigation." The plaintiff,

Preliminarily, we note that the plaintiff, relying on the state building code, also raises the following claims. First, Professional Services breached the duty it owed to the plaintiff, under the code, to inspect 100 percent of all welds on the project. Second, certain general provisions of Professional Services' subcontract obligated it, regardless of any conflicting specific provisions in the subcontract, to follow the state building code. Therefore, the state building code, which, under the plaintiff's interpretation required Professional Services to inspect all welds, negated any provisions in the subcontract that imposed on Professional Services a duty to perform only periodic, random inspections of welds. Third, Professional Services failed, as required by the state building code, to review Berlin Steel's quality control manual and its records of inspections. Finally, the structural steel specifications in Professional Services' subcontract violated public policy because, through them, it attempted to shield itself from the obligations imposed by the state building code. None of these claims, however, was presented to the trial court on the summary judgment motion. Therefore, we decline to address them.

The plaintiff argues that his claims relying on the state building code have been preserved because he stated in his memorandum in opposition to summary judgment that "[Professional Services'] obligations

however, made no such argument to the trial court. The parties presented the summary judgment motion to the trial court, which decided it. We see no reason in the present appeal to depart from our usual practice of deciding appeals on the basis on which the case was litigated in the trial court. Furthermore, we note that we have, in *Gould*, certified for further review the question of whether "the Appellate Court properly conclude[d] that the trial court lacked authority to render summary judgment because . . . the case was complex . . . ?" *Gould* v. *Mellick & Sexton*, supra, 259 Conn. 902. Finally, although this case was on the trial court's complex litigation docket, neither the facts nor the law applicable to the present case were so complex that, even if the doctrine purportedly announced by the Appellate Court in *Gould* represents our law, it would apply to the present case.

were governed by the 1984 edition of [American Welding Society (AWS) standards] D1.1 . . . ."[11] Furthermore, the plaintiff relies on the deposition testimony of his expert, Albert J. Moore, Jr., which made repeated references to the BOCA National Building Code of 1987, as supplemented in 1988 (BOCA),[12] and § 6 of AWS D1.1, both of which have been adopted by § 29-252-1a of the Regulations of Connecticut State Agencies as part of the state building code. None of the allegations in the operative complaint, however, claim that the violation of any provision of the state building code by Professional Services constituted negligence under the contract. Moreover, the trial court, in its memorandum of decision on reconsideration of Professional Services' motion for summary judgment, did not address the issue of whether the contract created a duty in Professional Services to adhere to the state building code. Indeed, the trial court's memorandum of decision did not mention either BOCA or AWS D1.1 at all.

Instead, the trial court understood the plaintiff to be making the following four claims on summary judgment: (1) Professional Services breached its duty to inspect 100 percent of all welds as required by drawing S9, note 21, of the structural steel notes, which was incorporated into the contract by reference; (2) Professional Services failed to review welder qualifications of Berlin Steel employees, as required by the structural steel specifications of the contract; (3) under the statement of special inspections, filed by Professional Services with the local municipal authority, Professional Services assumed a duty to inspect 100 percent of all welds, which it failed to do;[13] and (4) Professional Ser-

[11] AWS D1.1 is issued by the American Welding Society, Inc., and establishes standards relating to welding.

[12] BOCA is a national building code that is issued by the Building Officials and Code Administrators International, Inc.

[13] Although the plaintiff relies on the statement of special inspections on appeal, he has changed the nature of this claim, so that it now depends on his interpretation of the state building code. It is not, therefore, preserved

vices breached the duty of care it owed to the plaintiff under *Gazo* v. *Stamford*, supra, 255 Conn. 245.[14] The trial court considered each of these claims in turn and rejected them. If the plaintiff believed that the trial court failed to address one or more of the arguments he had advanced in opposition to summary judgment, the plaintiff could have filed a motion for articulation pursuant to Practice Book § 66-5, but he did not. Because the plaintiff failed to move for articulation, we must take the trial court's decision as properly defining the scope of the plaintiff's claims presented to the trial court. Thus, the record does not support the contention that the plaintiff had raised in the trial court any claims relying on BOCA and AWS D1.1.[15]

The plaintiff's only remaining claim on appeal, then, is that Professional Services' failure to perform its duty to inspect under the contract constituted negligence. Specifically, the plaintiff argues that, even if Professional Services were obligated to perform only periodic, random inspections of welds under the contract, it was negligent in performing that duty. We are not persuaded.

for review. Before the trial court, the plaintiff argued that, through the statement of special inspections, a report prepared and filed by Thomas A. Torrenti, the special inspector for the project, on behalf of Professional Services, Professional Services represented that it had inspected 100 percent of all welds on the project. On appeal, the plaintiff now argues that, through the statement of special inspections, which lists the applicable BOCA sections next to each listed task, Professional Services represented that it had complied with the state building code.

[14] As with the plaintiff's argument regarding the statement of special inspections, the plaintiff has recast this claim in the context of his interpretation of the state building code. This issue, therefore, is not properly preserved because the plaintiff now argues that it was Professional Services' status as a special inspector under the state building code that created a duty in it owed to all who were likely to be injured by any failure of it to perform its duties under the code.

[15] The plaintiff also had claimed that Professional Services' failure to act in accordance with BOCA and AWS D1.1 constituted negligence per se, but has since conceded that he failed to preserve this claim and has withdrawn it.

Section 05120 of the structural steel specifications, which were incorporated as schedule A of the subcontract between Professional Services and Sordoni, clearly stated that the contract did not create a duty owed to anyone other than the owner, Pitney Bowes. Specifically, § 05120 provides as follows in § 2..4 (B): "Inspection and testing which may be provided by the Owner's independent Inspection and Testing Agency . . . is *solely for Owner's benefit.* If Contractor wishes to utilize inspection and testing reports of shop and field [work], he may do so at his own responsibility . . . ." (Emphasis added.) Subsection (C) of § 2..4 of § 05120, further provides that the "Inspection and Testing Agency engaged by Owner shall not incur any responsibility for shop or field work as outlined hereinbelow since they are checking *on behalf of the Owner.* Contractor is fully responsible for inspection and testing herein required . . . ." (Emphasis added.) The purpose of these provisions was clear—to allow Pitney Bowes to retain its own inspection and testing agency without incurring liability or relieving Berlin Steel from the responsibility for inspection and testing. Therefore, regardless of the scope of any contractual duty to inspect owed by Professional Services, such a duty would have been owed to Pitney Bowes, not to the plaintiff. Thus, it is immaterial whether Professional Services owed a duty to inspect all welds or merely a duty to perform periodic, random inspections. The subcontract simply did not create any duty in Professional Services, owed to the plaintiff, to inspect any welds on the project.

The judgment is affirmed.

In this opinion the other justices concurred.