NORMAN PELLETIER ET AL. *v.* SORDONI/SKANSKA
CONSTRUCTION COMPANY
(SC 16743)
(SC 16747)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.

Argued September 11, 2002—officially released July 1, 2003

*William H. Clendenen, Jr.*, with whom were *Nancy L. Walker* and, on the brief, *Kevin C. Shea*, for the appellants in both appeals (plaintiffs).

*Joseph B. Burns,* with whom was *Zisca R. Burkley,* for the appellee in Docket No. SC 16743 (defendant).

*Anthony J. Natale,* with whom were *Michael A. Fusco* and, on the brief, *Richard F. Wareing,* for the appellee in Docket No. SC 16747 (defendant Professional Services Industries, Inc.).

*Donna Civitello* and *Robert F. Carter* filed briefs for The Connecticut Trial Lawyers Association and The Workers' Compensation Section of the Connecticut Bar Association as amici curiae.

*Opinion*

BORDEN, J. In these two consolidated appeals, the plaintiffs, Norman Pelletier, and his wife, Reine Pelletier,[1] appeal[2] from the summary judgment of the trial court, rendered in favor of the defendants, Sordoni/Skanska Construction Company (Sordoni) and Professional Services Industries, Inc. (Professional Services).[3]

---

[1] The claims of Reine Pelletier are solely for loss of consortium. Because those claims are derivative of the claims of Norman Pelletier, we refer to Norman Pelletier as the plaintiff.

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. This case was originally decided on February 11, 2003. See *Pelletier* v. *Sordoni/Skanska Construction Co.,* 262 Conn. 372, 815 A.2d 82 (2003). Thereafter, the plaintiffs moved for reconsideration and reargument en banc pursuant to Practice Book § 71-5. In addition, The Connecticut Trial Lawyers Association and the Workers' Compensation Section of the Connecticut Bar Association applied to appear as amici curiae and to file briefs in support of the plaintiffs' motion for reconsideration and for reargument en banc. We granted the applications of the amici curiae, and they filed briefs in support of the plaintiffs' motion as to the plaintiffs' claim against the defendant Sordoni/Skanska Construction Company. As we indicate herein, we now reconsider our decision, albeit not en banc, regarding the plaintiffs' negligence claim against Sordoni/Skanska Construction Company only. Accordingly, this opinion supersedes our prior decision; id.; in all respects.

[3] The plaintiff's action originally was brought against Sordoni. Thereafter, the trial court granted the plaintiff's motion to cite in Professional Services as a party defendant.

The plaintiff claims that the trial court improperly determined that neither Sordoni nor Professional Services could be held liable to the plaintiff for alleged negligence, and that Sordoni could not be held liable for breach of contract. We reverse the judgment regarding the negligence claim against Sordoni, and we affirm the judgment in all other respects.

The following procedural history is relevant to our resolution of these appeals. In his complaint, the plaintiff alleged negligence as to both Sordoni and Professional Services, and breach of contract as to Sordoni alone. Both defendants moved for summary judgment. Sordoni argued that, pursuant to the rule set forth by the Appellate Court in *Ray* v. *Schneider*, 16 Conn. App. 660, 548 A.2d 461, cert. denied, 209 Conn. 822, 551 A.2d 756 (1988), it could not be held liable in negligence to the employee of its independent subcontractor. Sordoni also argued that the contract that was alleged in count two of the complaint did not exist. Professional Services argued that it did not owe a duty to the plaintiff under its subcontract with Sordoni. The trial court granted both motions for summary judgment and rendered judgment for the defendants accordingly. These appeals followed.

The parties presented the following undisputed facts to the trial court on the motions for summary judgment. At the time of the incident giving rise to this action, Sordoni was the general contractor for the "Pitney Bowes project," a building under construction for a large shipping company, Pitney Bowes, Inc. (Pitney Bowes). The plaintiff was an employee of Berlin Steel Construction Company (Berlin Steel), the structural steel fabrication and erection subcontractor for the project. Sordoni hired Professional Services to inspect the work performed by Berlin Steel.

Under its subcontract with Sordoni, Berlin Steel had the responsibility to provide all of the structural steel

for the Pitney Bowes project, and to ensure its integrity. This included the duty to weld connections in the structural steel that would allow for the interconnection of steel members as a load-bearing, structural frame for the building. Furthermore, Berlin Steel had the duty to inspect those welds, ensuring their ability to bear weight. Under its contract with Berlin Steel, Sordoni reserved the right to inspect the structural steel, "solely for [its own] benefit." The contractual documents emphasized that Sordoni's "[i]nspection and acceptance, or failure to inspect, shall in no way relieve [Berlin Steel] from [its] responsibility to furnish satisfactory material strictly in compliance with the [c]ontract [d]ocuments."

On June 20, 1994, the plaintiff suffered serious physical injuries in an accident at the Pitney Bowes construction site. At the time of the accident, he was working beneath the building's large steel frame, which his employer, Berlin Steel, had been hired to build. The plaintiff was in the process of installing metal sheet flooring between two steel columns when several of his coworkers interrupted his work to install a two ton crossbeam between the columns. The plaintiff stepped away while his coworkers bolted the crossbeam to seat connections, which are steel flanges that enable the interconnection of large structural members, located on each of the columns. One of the seat connections, on column 313, had been only tack welded to the column. A tack weld is a weak, provisional weld, which is intended only to hold a piece in place pending a full, load-bearing weld. The tack weld on column 313 did not immediately give way under the load of the crossbeam. After his coworkers secured the crossbeam to the seat connections on the columns, the plaintiff returned to work beneath the crossbeam. Within minutes, the seat connection broke and the corresponding end of the crossbeam fell, striking him. The plaintiff suffered severe

injuries and is currently recovering workers' compensation benefits from Berlin Steel for his injuries. Further facts and procedural history will be set forth where necessary.

We first set forth the standard of review applicable to both of these appeals. Each appeal arises from a judgment of the trial court granting a motion for summary judgment. "[T]he standard of review of a trial court's decision to grant a motion for summary judgment is well established. Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Elliott* v. *Waterbury*, 245 Conn. 385, 391, 715 A.2d 27 (1998). With this standard of review in mind, we turn to the plaintiff's claims on appeal.

I

THE PLAINTIFF'S CLAIMS AGAINST SORDONI

In his appeal against Sordoni, the plaintiff claims that the trial court improperly determined that: (1) the general contractor nonliability rule set forth in *Ray* v. *Schneider*, supra, 16 Conn. App. 663–65 (injured employee of subcontractor, unlike member of general public, may not sue general contractor for damages based on general contractor's negligence) barred recovery under count one of the plaintiff's complaint, which sounded in negligence; and (2) under the plaintiff's breach of contract count, neither Sordoni's contract with Pitney Bowes nor an orientation and procedures manual that Sordoni had distributed to the plaintiff

created a duty to the plaintiff.[4] We agree with the plaintiff regarding his negligence count, and we disagree with him regarding his breach of contract count.

The plaintiff's complaint against Sordoni was based on allegations of both negligence and breach of contract. In the negligence count, the plaintiff alleged that Sordoni had breached a range of legal duties, with statutory and public policy sources. More specifically, the plaintiff alleged that Sordoni "knew or in the exercise of reasonable care . . . should have known" that the job site was unsafe, and failed to abate the danger of the defective weld. The plaintiff alleged further that Sordoni had a duty to inspect the structural steel, including "all main stress carrying elements, welding material and bolting material . . . all steel welds . . . [and] the steel frame of the column upon which the seat angle connection collapsed," yet Sordoni failed to do so, in violation of the state building code. Regs., Conn. State Agencies § 29-252-1a. In the breach of contract count, the plaintiff alleged that Sordoni had entered into a contract with the plaintiff, as evidenced by the orientation and procedures manual that Sordoni had required the plaintiff to sign prior to commencing work for Berlin Steel on the project.

In its motion for summary judgment, Sordoni argued that, as a matter of law, with respect to the negligence count, Sordoni, as a general contractor, could not be

---

[4] Although the plaintiff also argues on appeal that the trial court improperly determined disputed issues of causation in his case against Sordoni, in light of our disposition of both of the plaintiff's claims against Sordoni, we need not consider this contention.

In the present appeal, the plaintiff also relies on Sordoni's contract with Berlin Steel as a source of a contractual duty to the plaintiff under his breach of contract count. As we indicate later in this opinion, however, in the summary judgment proceedings in the trial court, the plaintiff did not rely on that contract. We confine our consideration, therefore, to those contractual sources presented to the trial court, namely, the Pitney Bowes contract and the orientation and procedures manual.

held liable to the plaintiff, an employee of Sordoni's subcontractor, and that this issue was controlled by *Ray* v. *Schneider,* supra, 16 Conn. App. 660. Sordoni also argued that, to the extent that the plaintiff relied on certain contractual duties to provide a safe workplace, such reliance was foreclosed by *Ray,* and that the contractual documents did not create any duty in favor of the plaintiff. In opposition, the plaintiff argued that Sordoni owed the plaintiff a duty of care arising out of certain contractual documents, that the *Ray* decision was not controlling, and that certain of the exceptions to the nonliability rule of *Ray* applied. With respect to the breach of contract claim, Sordoni argued that the orientation and procedures manual did not create any contractual obligations to the plaintiff, but served only as an "acknowledgement that . . . [the plaintiff] had reviewed the rules and regulations contained therein, and that his compliance therewith was required in order to work on the [p]roject." In opposition, the plaintiff argued that there were two contractual sources of Sordoni's duty to the plaintiff: (1) Sordoni's contract with Pitney Bowes; and (2) the orientation and procedures manual.

The trial court concluded that the rule of nonliability established in *Ray* barred the plaintiff's negligence claim. As to the plaintiff's contractual claim, the court ruled that: (1) Sordoni's obligations under its contract with Pitney Bowes were solely for the benefit of Pitney Bowes, and that the plaintiff was not a third party beneficiary of that contract; and (2) the orientation and procedures manual simply set forth general obligations by all involved in the project to provide a safe workplace, and that it did not create an exception to the nonliability rule established in *Ray.* Accordingly, the trial court granted Sordoni's motion for summary judgment.

A

The Plaintiff's Negligence Claim

The plaintiff claims that the trial court improperly determined that the general contractor nonliability rule set forth in *Ray* v. *Schneider*, supra, 16 Conn. App. 663–65, barred recovery under count one of his complaint, which sounded in negligence. We agree.[5]

As a general rule, "an employer is not liable for the negligence of its independent contractors. *Douglass* v. *Peck & Lines Co.*, 89 Conn. 622, 627, 95 A. 22 (1915); W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 71, p. 509; 41 Am. Jur. 2d, Independent Contractors § 29 (1995)." *Gazo* v. *Stamford*, 255 Conn. 245, 256–57, 765 A.2d 505 (2001); *Alexander* v. *Sherman's Sons Co.*, 86 Conn. 292, 298, 85 A. 514 (1912); 2 Restatement (Second), Torts § 409, p. 370 (1965). "The explanation for [this rule] most commonly given is that, since the employer has no power of control over the manner in

---

[5] We ordinarily decide an appeal on the basis on which the case was litigated and decided in the trial court. *Imperial Casualty & Indemnity Co.* v. *State*, 246 Conn. 313, 320, 714 A.2d 1230 (1998). As we read the trial court's memorandum of decision, the court ruled in Sordoni's favor on the plaintiff's negligence claim solely on the basis of the nonliability rule articulated in *Ray* v. *Schneider*, supra, 16 Conn. App. 663–65. Therefore, we do not consider the plaintiff's claims on appeal that the various contracts, the state building code, or other statutory or regulatory sources, provided a basis for a legal duty owed by Sordoni to an employee of its independent contractor, because the trial court did not decide, in ruling on the summary judgment motion, whether those alleged sources created a duty in Sordoni to the plaintiff. Thus, those alleged sources of duty may be addressed by the trial court, if necessary, on remand. In this connection, however, we note that, although the parties did not refer the trial court to the significance of General Statutes § 31-291, we consider it in the context of the present appeal because, as we indicate herein, that statute is central to the question of Sordoni's potential common-law liability to the plaintiff for negligence and, therefore, it comes within the plain error doctrine. See, e.g., *Genovese* v. *Gallo Wine Merchants, Inc.*, 226 Conn. 475, 480 n.6, 628 A.2d 946 (1993) ("[i]t is plain error for a trial court to fail to apply an applicable statute, even in the absence of the statute having been brought to its attention by the parties").

which the work is to be done by the contractor, it is to be regarded as the contractor's own enterprise, and [the contractor], rather than the employer, is the proper party to be charged with the responsibility of preventing the risk, and bearing and distributing it." 2 Restatement (Second), supra, § 409, comment (b).

This same rule applies, as a general matter, to general contractors as employers of independent subcontractors: a general contractor is not liable for the torts of its independent subcontractors. *Douglass* v. *Peck & Lines Co.*, supra, 89 Conn. 627. We have long held, however, that "[t]o this general rule there are exceptions, among them these: If the work contracted for be unlawful, or such as may cause a nuisance, or is intrinsically dangerous, or in its nature is calculated to cause injury to others, or if the contractee negligently employ an incompetent or untrustworthy contractor, or if he reserve in his contract general control over the contractor or his servants, or over the manner of doing the work, or if he in the progress of the work assume control or interfere with the work, or if he is under a legal duty to see that the work is properly performed, the contractee will be responsible for resultant injury. *Norwalk Gas Light Co.* v. *Norwalk*, 63 Conn. 495, 28 Atl. 32 [1893]; *Lawrence* v. *Shipman*, 39 Conn. 586 [1873]; *Alexander* v. *Sherman's Sons Co.*, [supra, 86 Conn. 293]; *St. Paul Water Co.* v. *Ware*, 83 U.S. (16 Wall.) 566 [21 L. Ed. 485 (1873)]; *Creed* v. *Hartmann*, 29 N.Y. 591 [1864]. *So, too, the contractee or proprietor will be liable for injury which results from his own negligence. Lawrence* v. *Shipman*, [supra, 590]." (Emphasis added.) *Douglass* v. *Peck & Lines Co.*, supra, 627.

Consistent with these exceptions, we have long held that, in the absence of statutory immunity based on the principal employer doctrine, discussed later in this opinion, a general contractor may, depending on the circumstances, be held liable to an employee of its

subcontractor for its own negligence. See, e.g., *Gigliotti* v. *United Illuminating Co.*, 151 Conn. 114, 193 A.2d 718 (1963); *Greenwald* v. *Wire Corp. of America*, 131 Conn. 465, 40 A.2d 748 (1944); *King* v. *Palmer*, 129 Conn. 636, 30 A.2d 549 (1943); *Bogoratt* v. *Pratt & Whitney Aircraft Co.*, 114 Conn. 126, 157 A. 860 (1932).

The enactment in 1913 of the Workers' Compensation Act, however, created, by implication, a limitation on the rule that a general contractor could be liable to an employee of its subcontractor for its own negligence. That limitation is derived from what is known as the principal employer doctrine, now embodied in General Statutes § 31-291.[6] Under the provisions of § 31-291, if an employer, known as a "principal employer," meets the three requirements of the first sentence of the statute,[7] it becomes liable to pay workers' compensation benefits to an employee of its independent subcontrac-

---

[6] General Statutes § 31-291 provides: "When any principal employer procures any work to be done wholly or in part for him by a contractor, or through him by a subcontractor, and the work so procured to be done is a part or process in the trade or business of such principal employer, and is performed in, on or about premises under his control, such principal employer shall be liable to pay all compensation under this chapter to the same extent as if the work were done without the intervention of such contractor or subcontractor. The provisions of this section shall not extend immunity to any principal employer from a civil action brought by an injured employee or his dependent under the provisions of section 31-293 to recover damages resulting from personal injury or wrongful death occurring on or after May 28, 1988, unless such principal employer has paid compensation benefits under this chapter to such injured employee or his dependent for the injury or death which is the subject of the action."

As originally enacted, § 31-291 contained only its first sentence, and remained in that form until 1988, when it was amended by No. 88-226 of the 1988 Public Acts, to include the second sentence. We discuss later in this opinion the significance of that amendment to the present case.

[7] These three requirements have been summarized as follows: "(1) the relation of principal employer and contractor must exist in work wholly or in part for the former; (2) the work must be on or about premises controlled by the principal employer; [and] (3) the work must be a part or process in the trade or business of the principal employer." (Internal quotation marks omitted.) *Gigliotti* v. *United Illuminating Co.*, supra, 151 Conn. 118.

tor, who was injured in the course of his employment. The purpose of the principal employer provision "is to afford full protection to workmen, by preventing the possibility of defeating the [Workers' Compensation] Act by hiring irresponsible contractors or subcontractors to carry on a part of the [principal] employer's work." *Johnson* v. *Mortenson*, 110 Conn. 221, 225, 147 A. 705 (1929).

By necessary implication, however, as a result of the exclusivity provision of the Workers' Compensation Act, if a contractor *was* a "principal employer" within the meaning of § 31-291, and therefore liable for workers' compensation benefits to an injured employee of the principal employer's subcontractor, it could not be held liable at common law to that same employee. See, e.g., *Gigliotti* v. *United Illuminating Co.*, supra, 151 Conn. 118. Thus, § 31-291, read together with the exclusivity provision, created a statutory immunity from claims of common-law liability asserted by injured employees of subcontractors, in favor of a narrow class of contractors, namely, those who came within the provisions of § 31-291 as "principal employers." See footnote 6 of this opinion. Therefore, prior to 1988, when an employee of a subcontractor on a construction project was injured and sought to recover common-law damages from, for example, the general contractor under one of the exceptions to the general rule of nonliability of a general contractor for the torts of its independent subcontractor, the factual question often was whether the general contractor was a "principal employer" within the meaning of § 31-291: if the general contractor was a principal employer, it would not be liable to the injured employee as a matter of law; if the general contractor was not a principal employer, it could be liable, depending on whether one of the exceptions to nonliability had been satisfied. See, e.g., *Gigliotti* v. *United Illuminating, Co.*, supra, 118–19.

As The Connecticut Trial Lawyers Association points out in its amicus brief, after the passage of the Workers' Compensation Act, employees of uninsured subcontractors successfully sought workers' compensation benefits from principal employers; see, e.g., *Massolini* v. *Driscoll,* 114 Conn. 546, 159 A. 480 (1932); and employees of subcontractors successfully prosecuted common-law negligence actions against contractors who could not establish that they were principal employers under § 31-291. See, e.g., *Buytkus* v. *Second National Bank,* 127 Conn. 316, 16 A.2d 579 (1940). Moreover, as the amicus also points out, with the increasingly frequent requirement, on the part of general contractors, of certificates of insurance from their subcontractors, and with the creation of the second injury fund to pay workers' compensation benefits to injured employees of uninsured employers, workers' compensation claims against principal employers for benefits became rare. Common-law claims against general contractors that were not principal employers, however, continued to be successfully asserted. See, e.g., id.

It is also important to note that, until 1988, this immunity from common-law liability to the injured employee applied to a principal employer irrespective of whether the employer actually had paid any workers' compensation benefits to the employee. The principal employer immunity depended, therefore, on whether the employer met the three requirements of § 31-291 and was, consequently, legally liable for such benefits, even if the employer had not actually paid such benefits.

Thus, it is fair to summarize the state of our law in this area prior to 1988 as follows. When an employee of a subcontractor was injured in the course of his employment and sought to recover common-law damages from the general contractor, he could not do so if the general contractor was a principal employer within the meaning of § 31-291; in that event, his remedy

against the general contractor was limited to workers' compensation benefits. Because of the certificates of insurance required of the subcontractors and because of the benefits provided by the second injury fund, however, the principal employer was rarely called upon actually to pay those benefits. Thus, principal employers enjoyed an immunity from suit for which they exchanged very little, if anything. If, however, the general contractor was not a principal employer, the injured employee could recover against the general contractor if he could establish one of the exceptions to the general rule of nonliability of general contractors for the torts of its independent contractors, or if he could establish a basis for a direct claim of negligence by the general contractor. See *Douglass* v. *Peck & Lines Co.*, supra, 89 Conn. 627. Under that scheme, therefore, it would have been inconsistent with the immunity granted, by implication of the exclusive remedy provision of the Workers' Compensation Act, to the principal employer, to have barred the same employee from suing a general contractor who was *not* a principal employer.

In 1988, moreover, the legislature amended § 31-291 by adding the following sentence: "The provisions of this section shall not extend immunity to any principal employer from a civil action brought by an injured employee or his dependent under the provisions of [General Statutes §] 31-293[8] to recover damages

---

[8] General Statutes § 31-293 provides: "(a) When any injury for which compensation is payable under the provisions of this chapter has been sustained under circumstances creating in a person other than an employer who has complied with the requirements of subsection (b) of section 31-284, a legal liability to pay damages for the injury, the injured employee may claim compensation under the provisions of this chapter, but the payment or award of compensation shall not affect the claim or right of action of the injured employee against such person, but the injured employee may proceed at law against such person to recover damages for the injury; and any employer or the custodian of the Second Injury Fund, having paid, or having become obligated to pay, compensation under the provisions of this chapter may bring an action against such person to recover any amount that he has paid or has become obligated to pay as compensation to the injured

resulting from personal injury or wrongful death

employee. If the employee, the employer or the custodian of the Second Injury Fund brings an action against such person, he shall immediately notify the others, in writing, by personal presentation or by registered or certified mail, of the action and of the name of the court to which the writ is returnable, and the others may join as parties plaintiff in the action within thirty days after such notification, and, if the others fail to join as parties plaintiff, their right of action against such person shall abate. In any case in which an employee brings an action against a party other than an employer who failed to comply with the requirements of subsection (b) of section 31-284, in accordance with the provisions of this section, and the employer is a party defendant in the action, the employer may join as a party plaintiff in the action. The bringing of any action against an employer shall not constitute notice to the employer within the meaning of this section. If the employer and the employee join as parties plaintiff in the action and any damages are recovered, the damages shall be so apportioned that the claim of the employer, as defined in this section, shall take precedence over that of the injured employee in the proceeds of the recovery, after the deduction of reasonable and necessary expenditures, including attorneys' fees, incurred by the employee in effecting the recovery. The rendition of a judgment in favor of the employee or the employer against the party shall not terminate the employer's obligation to make further compensation which the commissioner thereafter deems payable to the injured employee. If the damages, after deducting the employee's expenses as provided in this subsection, are more than sufficient to reimburse the employer, damages shall be assessed in his favor in a sum sufficient to reimburse him for his claim, and the excess shall be assessed in favor of the injured employee. No compromise with the person by either the employer or the employee shall be binding upon or affect the rights of the other, unless assented to by him. For the purposes of this section, the claim of the employer shall consist of (1) the amount of any compensation which he has paid on account of the injury which is the subject of the suit and (2) an amount equal to the present worth of any probable future payments which he has by award become obligated to pay on account of the injury. The word 'compensation', as used in this section, shall be construed to include incapacity payments to an injured employee, payments to the dependents of a deceased employee, sums paid out for surgical, medical and hospital services to an injured employee, the burial fee provided by subdivision (1) of subsection (a) of section 31-306, payments made under the provisions of sections 31-312 and 31-313, and payments made under the provisions of section 31-284b in the case of an action brought under this section by the employer or an action brought under this section by the employee in which the employee has alleged and been awarded such payments as damages. Each employee who brings an action against a party in accordance with the provisions of this subsection shall include in his complaint (A) the amount of any compensation paid by the employer or the Second Injury Fund on account of the

occurring on or after [May 28, 1988], unless such princi-

injury which is the subject of the suit and (B) the amount equal to the present worth of any probable future payments which the employer or the Second Injury Fund has, by award, become obligated to pay on account of the injury. Notwithstanding the provisions of this subsection, when any injury for which compensation is payable under the provisions of this chapter has been sustained under circumstances creating in a person other than an employer who has complied with the requirements of subsection (b) of section 31-284, a legal liability to pay damages for the injury and the injured employee has received compensation for the injury from such employer, its workers' compensation insurance carrier or the Second Injury Fund pursuant to the provisions of this chapter, the employer, insurance carrier or Second Injury Fund shall have a lien upon any judgment received by the employee against the party or any settlement received by the employee from the party, provided the employer, insurance carrier or Second Injury Fund shall give written notice of the lien to the party prior to such judgment or settlement.

"(b) When an injury for which compensation is payable under the provisions of this chapter is determined to be the result of a motor vehicle accident or other accident or circumstance in which a third person other than the employer was negligent and the claim is subrogated by the employer or its workers' compensation insurance carrier, the insurance carrier shall provide a rate adjustment to the employer's workers' compensation policy to reflect the recovery of any compensation paid by the insurance carrier prior to subrogation.

"(c) Notwithstanding the provisions of subsection (a) of this section, no construction design professional who is retained to perform professional services on a construction project, or any employee of a construction design professional who is assisting or representing the construction design professional in the performance of professional services on the site of the construction project, shall be liable for any injury on the construction project for which compensation is payable under the provisions of this chapter, unless responsibility for safety practices is specifically assumed by contract. The immunity provided by this subsection to any construction design professional shall not apply to the negligent preparation of design plans or specifications. For the purposes of this subsection 'construction design professional' means (1) any person licensed as an architect under the provisions of chapter 390, (2) any person licensed, or exempted from licensure, as an engineer under the provisions of chapter 391, or (3) any corporation organized to render professional services through the practice of either or both of such professions in this state.

"(d) Notwithstanding the provisions of subsection (a) of this section, the furnishing of or the failure to furnish safety inspections or safety advisory services (1) by an insurer incident to providing workers' compensation insurance to an employer, (2) pursuant to a contract providing for safety inspections or safety advisory services between an employer and a self-

pal employer has paid compensation benefits under chapter 568 to such injured employee or his dependent for the injury or death which is the subject of the action."[9] Public Acts 1988, No. 88-226, § 1. The purpose and effect of this amendment was to limit the implied common-law immunity of the principal employer to the situation in which it had in fact paid the workers' compensation benefits that presumably were the basis of its immunity. Implicit in this amendment, moreover, was the notion that, except in the isolated cases of its application, there would be no such immunity. In addition, the legislative history of the provision supports our conclusion that the legislature intended to subject principal employers to suit, unless they in fact had paid workers' compensation benefits.[10] Thus, after

insurance service organization incident to providing workers' compensation related services or (3) by a union representing employees of the employer, shall not subject the insurer or self-insurance service organization or their agents or employees, or the union, its members or the members of its safety committee, to third party liability for damages for injury, death or loss resulting therefrom unless the liability arises from a breach of a duty of fair representation of its members by a union. The immunity from liability extended under this subsection shall not be extended to any insurer or self-insurance service organization other than where the immunity is incident to the provision of workers' compensation insurance or workers' compensation related services."

[9] May 28, 1988, was the effective date of the statutory amendment, which was made effective upon passage. See Public Acts 1988, No. 88-226, § 2. As the brief of the amicus The Workers' Compensation Section of the Connecticut Bar Association points out, the legislative history of this amendment indicates that it was prompted by the notorious L'Ambiance Plaza incident in which the alleged negligence of the general contractor led to the deaths of dozens of employees of subcontractors when the building collapsed during construction. The general contractor was immune from suit, however, because of the principal employer doctrine. See 31 S. Proc., Pt. 8, 1988 Sess., pp. 2703–2705, remarks of Senator Steven Spellman.

[10] Representative Joseph A. Adamo, one of the sponsors of the legislation, summarized the effect of the bill as follows: "This bill . . . will allow contractors, employees injured on the job, or the dependents of contractors' employees killed on the job related accidents, to sue their principal employer. If he is not paying the [employees'] or the [dependents'] workers' compensation benefits for the accident." 31 H.R. Proc., Pt. 11, 1988 Sess., p. 3716. Adamo also remarked that the old system of granting a principal employer

this amendment, even a principal employer could be sued for damages if it had not in fact paid any workers' compensation benefits to the injured employee of a subcontractor.

We can only read this legislation as implicitly demonstrating the legislature's intent, as a matter of policy, to preserve the previously recognized right of an injured employee of a subcontractor to sue a general contractor who was not a principal employer. It would be wholly contrary to the policy of the 1988 legislation to hold otherwise. This is because, under the 1988 legislation, a general contractor who is a principal employer under § 31-291—and, therefore, whose business and work are closely tied to that of the subcontractor—may be sued by an injured employee of its subcontractor unless the general contractor in fact paid workers' compensation benefits to the employee. Given the language and policy of § 31-291, especially as amended in 1988, it would be anomalous to hold that an injured employee of a subcontractor may *not* sue a general contractor who

immunity from suit regardless of whether the employer had paid workers' compensation benefits, particularly when the principal employer was a general contractor, was "grossly unfair" and that the rule placed Connecticut in the minority in comparison to other jurisdictions. Id. Finally, Adamo noted the inconsistencies inherent in the old system: "[A]n injured employee of a general contractor can sue downstream against the negligent subcontractor. An injured employee of a subcontractor can sue cross stream, against another negligent subcontractor. But that same injured employee of a subcontractor cannot sue upstream against the general contractor on that particular job." Id., p. 3717. Senator Steven Spellman noted that the rule granting immunity to principal employers regardless of whether the employer paid workers' compensation benefits was "a judicially created immunity, which I do not believe the legislature intended when they passed [§] 31-291." 31 S. Proc., Pt. 8, 1988 Sess., p. 2703. Noting that the creation of the second injury fund meant that situations in which a general contractor would be liable for injuries to the employee of a subcontractor would be "few and far between"; id., p. 2704; Senator Spellman remarked on the "very inequitable situation" that resulted from the rule; id., p. 2703; namely, "that the principal employer received an immunity for which he did not provide any benefit to the employee." Id., p. 2704.

has *not* paid compensation benefits to the employee and who does *not* meet the requirements of the principal employer provisions—and, therefore, whose work and business are not at all tied to that of the subcontractor.

Consequently, we conclude that the summary judgment for Sordoni on the plaintiff's negligence claim must be reversed. An injured employee of a subcontractor may sue the general contractor, if he can establish a basis for the contractor's liability to him under our case law. He is not barred from doing so simply because, as *Ray* holds, the plaintiff is an employee of a subcontractor, rather than a member of the general public.[11]

This brings us, then, to the trial court's and Sordoni's reliance on *Ray*. The trial court, in rendering summary judgment for Sordoni on the plaintiff's negligence claim, relied on the holding of *Ray* v. *Schneider*, supra, 16 Conn. App. 663–65, that the exceptions to the rule of a general contractor's nonliability do not extend to employees of the general contractor's independent subcontractor. We conclude, however, that the reasoning of *Ray* is simply inconsistent with our law permitting employees of subcontractors to sue general contractors and cannot, therefore, bar the plaintiff's action against Sordoni.

The plaintiff in *Ray* was an employee of a subcontractor for a large building construction project. Id., 662. The defendants in *Ray* had hired the subcontractor to "excavate a trench and to install sewer, water and gas

---

[11] We emphasize that we do not hold that the plaintiff has established a factual or legal basis for his claim of Sordoni's liability. Those questions will have to be determined following our remand. Because the trial court ruled in Sordoni's favor solely on the basis of the holding in *Ray* that an employee of a subcontractor, as opposed to a member of the general public, may not, for various policy reasons, sue his employer's general contractor, and because we conclude that *Ray* does not control this case, we leave to the proceedings following our remand of this case the question of whether the plaintiff may prevail, either factually or legally.

utility pipelines . . . ." Id. The plaintiff alleged that the trench collapsed around him and severely injured him as a result of the subcontractor's negligence, and sought to hold the defendants, who were owners, lessees or developers of the project, liable under two theories: (1) that they should be held vicariously liable[12] for the negligence of the subcontractor; id., 663–64; and (2) that they should be held directly liable for negligently hiring the subcontractor. Id., 671–72.

The court in *Ray* rejected both claims. First, addressing the vicarious liability claim, the court began by acknowledging that "[o]dinarily, an employer of an independent contractor, absent an act of negligence on his own part, is not liable to others for the negligent acts of the contractor." Id., 663. The court then also acknowledged the various exceptions to this nonliability rule, such as when the general contractor retains control of the premises or supervises the subcontractor's work, when the work is inherently dangerous, or when the contractor has a nondelegable duty to take safety precautions imposed by statute or regulation. Id., 664. The court then held, however, that, although these exceptions to the nonliability of a general contractor applied to "allow third persons, such as innocent bystanders, to maintain a negligence action against the [general contractor]"; id.; "such vicarious liability does not extend to the employees of the independent contractor." Id., 665. The reasoning of the court was based

---

[12] "Vicarious liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of public policy that one person should be liable for the act of [another]. Its true basis is largely one of public or social policy under which it has been determined that, *irrespective of fault*, a party should be held to respond for the acts of another." (Emphasis added; internal quotation marks omitted.) *Alvarez* v. *New Haven Register*, 249 Conn. 709, 720, 735 A.2d 306 (1999). Thus, an allegation of vicarious liability does not involve the breach of any duty by the party vicariously liable.

on a line of cases holding to that effect; see id., 665–66; and on several policy reasons.[13]

Turning next to the plaintiff's claim of direct liability for personal negligence, the court first noted that the plaintiff's claim was that the defendants had negligently hired a certain independent contractor, not the employer of the plaintiff, who was incompetent to perform the work involved and that, as a consequence of that independent contractor's lack of due care, the plaintiff was injured. Id., 671. Citing *Douglass* v. *Peck & Lines Co.*, supra, 89 Conn. 627, the court then acknowledged the rule "that an employer may be liable to others for negligently employing an incompetent or untrustworthy independent contractor." *Ray* v. *Schneider*, supra, 16 Conn. App. 671. The court held, nonetheless, that "[f]or the reasons we articulated with respect to the issue of vicarious liability which are applicable to the issue of direct liability here, we conclude that the liability of the employer for physical harm to third per-

---

[13] The policy reasons articulated by the court in *Ray* v. *Schneider*, supra, 16 Conn. App. 660, may be summarized as follows: (1) employees of an independent contractor stand on a different footing from members of the general public, because they in effect assume certain risks of their employment and are entitled to workers' compensation benefits; id., 667–68; (2) the price of the contract between the general contractor and the subcontractor will ordinarily reflect the cost of the workers' compensation insurance and, therefore, the general contractor is already indirectly financing those benefits; id., 668; (3) imposition of common-law liability on the general contractor would subject the contractor to greater liability than if it had used its own employees on the job; id., 668–69; (4) holding the contractor vicariously liable would be contrary to the general principle that ordinarily one is liable for harm only when he caused it through his own fault; id., 669; (5) recovery in tort based on vicarious liability for injuries for which the employee already has been compensated by workers' compensation benefits would contravene the scheme of the Workers' Compensation Act; id., 669–70; (6) the employee has greater knowledge and control over the dangers of the work than does the general contractor; id., 670; and (7) public policy encourages developers and general contractors to employ independent contractors with expertise where the work is inherently dangerous, and imposition of vicarious liability would be a disincentive to such employment. Id.

sons under the negligent hiring doctrine does not apply where injuries are sustained by an employee of the [independent subcontractor] as opposed to the general public." (Internal quotation marks omitted.) Id., 672.

*Ray* stands for the broad proposition, therefore, that an employee of a subcontractor, unlike a member of the general public, may not sue the general contractor for damages, regardless of whether the plaintiff's claim is based on vicarious liability, direct negligence, or some other exception to the general rule on nonliability of a general contractor for the torts of its independent contractor. The doctrinal basis of this holding is the set of policy reasons articulated by the court in *Ray*. See footnote 13 of this opinion.

We acknowledge that a number of courts in other jurisdictions have held consistently with *Ray* for similar policy reasons. See, e.g., *Monk* v. *Virgin Islands Water & Power Authority*, 53 F.3d 1381 (3d Cir.), cert. denied, 516 U.S. 914, 116 S. Ct. 302, 133 L. Ed. 2d 207 (1995), and cases cited therein. We have no need to resolve this policy debate, however, because in our view the legislature has already done so. *Ray* is inconsistent with that legislative policy, and cannot, therefore, bar the plaintiff's negligence claim against Sordoni.

B

The Plaintiff's Contractual Claim

The plaintiff also claims that the trial court improperly determined that neither Sordoni's contract with Pitney Bowes nor the orientation and procedures manual created a duty owed by Sordoni to the plaintiff. We conclude that the trial court properly found that the plaintiff was not a third party beneficiary of Sordoni's contract with Pitney Bowes, and, thus, that Sordoni did not owe the plaintiff a duty by virtue of that contract. We further conclude that the orientation and procedures

manual did not represent a contract between Sordoni and the plaintiff. Therefore, the trial court properly rendered summary judgment for Sordoni on the plaintiff's breach of contract claim.

First, the plaintiff argues that Sordoni's contract with Pitney Bowes created a duty owed by Sordoni to the plaintiff. Specifically, the plaintiff argues that certain provisions of that contract "charged Sordoni with . . . safety and inspection responsibilities for the . . . purpose of preventing the type of harm suffered by [the plaintiff]." The plaintiff was not a contracting party of this agreement. Thus, his claim that the contract provides a legal duty proceeds under a third party beneficiary theory. We agree with the trial court that this contract did not create third party beneficiary rights in the plaintiff.

"[T]he ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the [mutual] intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary] and . . . that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making . . . ." (Internal quotation marks omitted.) *Grigerik* v. *Sharpe*, 247 Conn. 293, 311–12, 727 A.2d 526 (1998). All of the evidence relevant to the contracting parties' mutual intent indicates that the "safety and inspection" obligations referenced by the plaintiff were intended only to benefit Pitney Bowes. Throughout the written agreement, the parties articulated their intent that Sordoni be able to delegate duties, including safety and inspection duties, to subcontractors, such as the plaintiff's employer. The sole concern of these "safety and inspection" provisions was that, between Sordoni and Pitney Bowes, Sordoni would be the responsible party and "hold harmless the [o]wner with respect [to such responsibilities]." The common-

sense interpretation of these provisions is that the parties were not concerned with creating legal duties of Sordoni *to subcontractors and their employees.* Although, as the plaintiff argues, employees of a subcontractor working on the project site are *foreseeable* beneficiaries of any safety measures Sordoni might adopt in performing the contract, foreseeability alone is insufficient to create third party beneficiary rights. *Gazo* v. *Stamford*, supra, 255 Conn. 267.

The plaintiff argues that "the trial court essentially ignored the [orientation and] procedures manual, a contract in which Sordoni expressly promised to provide a safe workplace and be responsible for the well-being of all subcontractors' employees, including . . . [the plaintiff]." As summarized previously, the trial court did not ignore the plaintiff's claim that the orientation and procedures manual represented a contract between Sordoni and the plaintiff. The trial court addressed this claim in its memorandum of decision, stating: "The [plaintiff's] contractual claim . . . relies on the force and effect of the manual, the provisions of which cannot be distinguished from the general obligation by all involved in the project to provide and maintain a safe workplace on the owner's property." Thus, the court *did* address this claim, and resolved it against the plaintiff.

After reviewing the purported contractual document in light of the undisputed facts of the case, we agree with the trial court that Sordoni was entitled to judgment on this count. There is nothing in the orientation and procedures manual, or in the entire record, to suggest that the manual represented a contract by which Sordoni assumed direct contractual obligations to employees of Berlin Steel, such as the plaintiff. The plaintiff's argument to the contrary is not a reasonable interpretation of the manual. The undisputed surrounding circumstances, and the manual itself, indicate that the manual was an informational tool designed to educate the plain-

tiff in the protocols for the job site, not a legally binding contract. The plaintiff was required to read the manual and verify by signature that he understood its principles prior to his admission onto the work site. The language of the manual quoted by the plaintiff, even taken out of context, is informational rather than promissory in nature. It provides in relevant part: "[Sordoni] has been charged with the responsibility of constructing this project in a safe, efficient and timely manner." This language alludes to a preexisting duty "charged" by another party; it does not suggest a new undertaking by virtue of the manual itself. "The law does not make a contract when the parties intend none . . . ." (Internal quotation marks omitted.) *New Haven Tile & Floor Covering Co.* v. *Roman,* 137 Conn. 462, 464, 78 A.2d 336 (1951). Sordoni was entitled to judgment as a matter of law that the orientation and procedures manual did not create the contractual duties alleged.

## II

## THE PLAINTIFF'S CLAIM AGAINST PROFESSIONAL SERVICES

In his appeal from the trial court's judgment in favor of Professional Services, the plaintiff claims that the court improperly concluded that no issue of material fact remained as to whether Professional Services was negligent in performing its contractual duty to inspect the welds on the project.[14] We disagree.

---

[14] Additionally, the plaintiff relies on the Appellate Court's decision in *Gould* v. *Mellick & Sexton,* 66 Conn. App. 542, 555, 785 A.2d 265, cert. granted, 259 Conn. 902, 789 A.2d 990 (2001), to argue that summary judgment is "an inappropriate way to conclude complex litigation." The plaintiff, however, made no such argument to the trial court. The parties presented the summary judgment motion to the trial court, which decided it. We see no reason in the present appeal to depart from our usual practice of deciding appeals on the basis on which the case was litigated in the trial court. Furthermore, we note that, following the granting of certification, we concluded that "no case is too complex for summary judgment." *Gould* v. *Mellick & Sexton,* 263 Conn. 140, 147, 819 A.2d 216 (2003).

Preliminarily, we note that the plaintiff, relying on the state building code, also raises the following claims. First, Professional Services breached the duty it owed to the plaintiff, under the code, to inspect 100 percent of all welds on the project. Second, certain general provisions of Professional Services' subcontract obligated it, regardless of any conflicting specific provisions in the subcontract, to follow the state building code. Therefore, the state building code, which, under the plaintiff's interpretation required Professional Services to inspect all welds, negated any provisions in the subcontract that imposed on Professional Services a duty to perform only periodic, random inspections of welds. Third, Professional Services failed to review Berlin Steel's quality control manual and its records of inspections, as required by the state building code. Finally, the structural steel specifications in Professional Services' subcontract violated public policy because, through them, it attempted to shield itself from the obligations imposed by the state building code. None of these claims, however, was presented to the trial court on the summary judgment motion. Therefore, we decline to address them.

The plaintiff argues that his claims relying on the state building code have been preserved because he stated in his memorandum in opposition to summary judgment that "[Professional Services'] obligations were governed by the 1984 edition of [American Welding Society (AWS) standards] D1.1 . . . ."[15] Furthermore, the plaintiff relies on the deposition testimony of his expert, Albert J. Moore, Jr., which made repeated references to the BOCA National Building Code of 1987, as supplemented in 1988 (BOCA),[16] and § 6 of AWS D1.1,

---

[15] AWS D1.1 is issued by the American Welding Society, Inc., and establishes standards related to welding.

[16] BOCA is a national building code that is issued by the Building Officials and Code Administrators International, Inc.

both of which have been adopted by § 29-252-1a of the Regulations of Connecticut State Agencies as part of the state building code. None of the allegations in the operative complaint, however, claim that the violation of any provision of the state building code by Professional Services constituted negligence under the contract. Moreover, the trial court, in its memorandum of decision on reconsideration of Professional Services' motion for summary judgment, did not address the issue of whether the contract created a duty in Professional Services to adhere to the state building code. Indeed, the trial court's memorandum of decision did not mention either BOCA or AWS D1.1 at all.

Instead, the trial court understood the plaintiff to be making the following four claims on summary judgment: (1) Professional Services breached its duty to inspect 100 percent of all welds as required by drawing S9, note 21, of the structural steel notes, which was incorporated into the contract by reference; (2) Professional Services failed to review welder qualifications of Berlin Steel employees, as required by the structural steel specifications of the contract; (3) under the statement of special inspections, filed by Professional Services with the local municipal authority, Professional Services assumed a duty to inspect 100 percent of all welds, which it failed to do;[17] and (4) Professional Services breached the duty of care it owed to the plaintiff

---

[17] Although the plaintiff relies on the statement of special inspections on appeal, he has changed the nature of this claim, so that it now depends on his interpretation of the state building code. It is not, therefore, preserved for appellate review. Before the trial court, the plaintiff argued that, through the statement of special inspections, a report prepared and filed on behalf of Professional Services by Thomas A. Torrenti, the special inspector for the project, Professional Services represented that it had inspected 100 percent of all welds on the project. On appeal, the plaintiff now argues that, through the statement of special inspections, which lists the applicable BOCA sections next to each listed task, Professional Services represented that it had complied with the state building code.

under *Gazo* v. *Stamford*, supra, 255 Conn. 245.[18] The trial court considered each of these claims in turn and rejected them. Accordingly, the trial court rendered judgment in favor of Professional Services. Subsequently, the plaintiff filed a motion for articulation, which for the first time set out his claims relying on BOCA and AWS D1.1.[19] The trial court denied the motion. In response, the plaintiff filed a motion for review of the trial court's denial of his motion for articulation. The plaintiff argues that he has preserved his claims relying on BOCA and AWS D1.1 through the motion for articulation and the motion for review. We disagree. "[A]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal." (Internal quotation marks omitted.) *Alliance Partners, Inc.* v. *Oxford Health Plans, Inc.*, 263 Conn. 191, 204,

---

[18] As with the plaintiff's argument regarding the statement of special inspections, the plaintiff has recast this claim in the context of his interpretation of the state building code. This issue, therefore, is not properly preserved because the plaintiff now argues that it was Professional Services' status as a special inspector under the state building code that created a duty in it owed to all who were likely to be injured by any failure of Professional Services to perform its duties under the code.

[19] Specifically, the plaintiff stated in his motion for articulation: "The Special Inspection Report specifically refers to the 1988 supplement to the BOCA code, §§ 1307.3 et seq. in defining the inspections to be done. In § 1307.3.2, BOCA requires that '[a]ll stress carrying elements, welding material and bolting material shall be inspected for conformance with Table 1307.3.2.' Section 1307.3.3 states that [s]pecial inspections are required for bolts, welding and details as specified in Sections 1307.3.1 through 1307.3.3.3. Section 1307.3.3.2 provides that '[w]eld inspection shall be in conformance with Section 6 of AWS D1.1 listed in Appendix A.' It is unclear whether the trial court considered these provisions of BOCA when it determined that [Professional Services] was not required as a special inspector to inspect all welds." The plaintiff also sought articulation as to whether the trial court had considered Moore's deposition testimony as to BOCA and AWS D1.1.

819 A.2d 227 (2003). A motion for articulation is not a vehicle that allows a party to advance new legal arguments that were not properly presented to the trial court in the first place. Therefore, because the plaintiff did not present this argument to the trial court until after judgment, we must take the trial court's decision as properly defining the scope of the plaintiff's claims presented to the trial court. Thus, the record does not support the contention that the plaintiff had raised in the trial court any claims relying on BOCA and AWS D1.1.[20]

The plaintiff's only remaining claim on appeal, then, is that Professional Services' failure to perform its duty to inspect under the contract constituted negligence. Specifically, the plaintiff argues that, even if Professional Services were obligated to perform only periodic, random inspections of welds under the contract, Professional Services was negligent in performing that duty. We are not persuaded.

Section 05120 of the structural steel specifications, which were incorporated as schedule A of the subcontract between Professional Services and Sordoni, clearly stated that the contract did not create a duty owed to anyone other than the owner, Pitney Bowes. Specifically, § 05120 provides as follows in § 2..4 (B): "Inspection and testing which may be provided by the Owner's independent Inspection and Testing Agency . . . is *solely for Owner's benefit.* If Contractor wishes to utilize inspection and testing reports of shop and field [work], he may do so at his own responsibility . . . ." (Emphasis added.) Subsection (C) of § 2..4 of § 05120 further provides that the "Inspection and Testing Agency engaged by Owner shall not incur any

[20] The plaintiff also had claimed that Professional Services' failure to act in accordance with BOCA and AWS D1.1 constituted negligence per se, but has since conceded that he failed to preserve this claim and has withdrawn it.

responsibility for shop or field work as outlined herein-below since they are checking *on behalf of Owner.* Contractor is fully responsible for inspection and testing herein required . . . ." (Emphasis added.) The purpose of these provisions was clear—to allow Pitney Bowes to retain its own inspection and testing agency without incurring liability or relieving Berlin Steel from the responsibility for inspection and testing. Therefore, regardless of the scope of any contractual duty to inspect owed by Professional Services, such a duty would have been owed to Pitney Bowes, not to the plaintiff. Thus, it is immaterial whether Professional Services owed a duty to inspect all welds or merely a duty to perform periodic, random inspections. The subcontract simply did not create any duty in Professional Services, owed to the plaintiff, to inspect any welds on the project. Therefore, the trial court properly rendered summary judgment for Professional Services on the plaintiff's negligence claim.

The judgment is reversed with respect to the negligence claim against Sordoni and the case is remanded for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.