******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ELVIRA R. GONZALEZ ET AL. *v.* O AND G
INDUSTRIES, INC., ET AL.
(SC 19377)

Palmer, Zarella, Eveleigh, Espinosa, Robinson, Vertefeuille and Lavine, Js.

*Argued January 20—officially released August 2, 2016*

*James J. Healy*, with whom were *Joel T. Faxon* and, on the brief, *Eric P. Smith* and *Jason K. Gamsby*, for the appellants (plaintiff James L. Thompson II et al.).

*Michael S. Lynch*, with whom were *Charles W. Fleischmann* and, on the brief, *Thomas M. McKeon*, and *Kimberly A. Knox*, for the appellee (named defendant).

*Opinion*

ROBINSON, J. The sole issue in this appeal is whether a general contractor that implemented a contractor controlled insurance program (CCIP) to centralize the purchasing of workers' compensation insurance for a major project has "paid compensation benefits" to the employees of its subcontractors, thus entitling it to "principal employer" immunity under General Statutes § 31-291[1] from further claims by those employees. The plaintiffs, James L. Thompson II, Carol M. Thompson, and James McVay,[2] seek to recover damages resulting from the alleged negligence of the named defendant, O & G Industries, Inc.[3] The plaintiffs appeal[4] from the trial court's grant of the defendant's motion for summary judgment with respect to their tort claims. On appeal, the plaintiffs claim that the trial court improperly concluded that the defendant had "paid compensation benefits" on the basis of an incorrect interpretation of that term as used in § 31-291. We agree with the plaintiffs' claim that the trial court improperly interpreted the term "paid compensation benefits" in § 31-291, but further conclude that, even under the proper construction of the statute, no genuine issue of material fact exists as to whether the defendant paid compensation benefits to Thompson and McVay. Accordingly, we affirm the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. In 2009, the defendant served as the general contractor for the construction of a gas fired power plant in Middletown. The defendant hired a subcontractor, United Anco Services, Inc. (United Anco), to assemble scaffolding at the site. Thompson was an employee of United Anco. The defendant hired a second subcontractor, Ducci Electrical Contractors, Inc. (Ducci Electrical), to perform inspection and testing of instrumentation. Ducci Electrical, in turn, hired a third subcontractor, Instrument Sciences and Technologies, Inc. (Instrument Sciences), to perform the instrumentation and control work. McVay was an employee of Instrument Sciences.

Both United Anco and Ducci Electrical agreed to the standard subcontract used by the defendant. The defendant's standard subcontract required all bidders to include, as a line item in their bids, their insurance costs to complete their work. The subcontractors would calculate these costs using their individual insurance rates and anticipated payroll, plus allowances for any overhead and profit. The standard subcontract stated, however, that the defendant "may" elect to implement a CCIP to "centralize the purchasing of insurance" for the project. This "consolidated purchasing of insurance" would include, inter alia, workers' compensation insurance for the defendant and all tiers of subcontractors. If the defendant opted to implement a CCIP, participation in the program would be "mandatory," and, after

enrolling in the program, each subcontractor would be relieved of its contractual duty to provide workers' compensation insurance. The defendant would then use a change order process to reduce the price of each subcontract by the amount identified for the subcontractor's insurance costs.

The defendant subsequently implemented a CCIP, which provided workers' compensation coverage for itself and all enrolled subcontractors through policies issued by the Old Republic General Insurance Corporation (Old Republic).[5] Both United Anco and Instrument Sciences enrolled in the program, and each received individual insurance policies in their names. As the "[s]ponsor" of the program, the defendant was solely responsible for paying the premiums for its own coverage and that of all enrolled subcontractors. The defendant subsequently paid a premium in the amount of $1,150,465 for workers' compensation coverage provided under the CCIP.

Thereafter, the defendant issued change orders deducting the insurance costs specified in the bids from United Anco and Ducci Electrical from their respective subcontracts.[6] Ducci Electrical, in turn, issued a corresponding change order to its subcontract with Instrument Sciences, reducing it by the amount equal to Instrument Sciences' insurance costs.

Over approximately the next eighteen months, the payrolls of United Anco, Ducci Electrical, and Instrument Sciences increased due to certain demands necessary to complete the power plant project. According to the CCIP Insurance Manual (manual),[7] if a subcontractor's payroll increased, the subcontractor would issue a change order to the subcontract accounting for the additional labor, including the cost the subcontractor would have incurred to provide its own insurance for that labor, had a CCIP not been in place.[8] This amount would represent the amount that would have been included in the subcontractor's original bid. The defendant would then issue its own change order to the subcontract to reduce it by the subcontractor's increased insurance costs, because it now provided insurance to all of the subcontractor's employees through the CCIP. During that time period, the defendant issued several additional change orders to its subcontract with United Anco to account for its increased payroll and insurance costs.[9]

On February 7, 2010, an explosion occurred at the power plant construction site, injuring Thompson and McVay.[10] Under the terms of the CCIP, the defendant was required to pay a $250,000 deductible in the event that workers' compensation benefits were to be paid. The defendant paid this deductible to Old Republic, along with a claim handling fee in the amount of $17,500 to administer workers' compensation benefits. Both of these payments were made to Old Republic by checks

drawn on the defendant's account. Thompson and McVay subsequently applied for and received workers' compensation benefits under the CCIP, including medical expenses and lost wages.[11]

The plaintiffs brought the present action against the defendant under General Statutes § 31-293 (a),[12] asserting, inter alia, negligence and strict liability claims in connection with injuries caused by the explosion. The defendant moved for summary judgment on these claims, arguing that it was immune from civil actions under § 31-291 because it was a "principal employer" that had paid workers' compensation benefits to Thompson and McVay. The plaintiffs did not challenge the defendant's status as a principal employer, but asserted that a genuine issue of material fact existed as to whether the defendant had "paid" workers' compensation benefits. In particular, the plaintiffs argued that, although the defendant sponsored a CCIP and paid the premium under the policies, it was the subcontractors that had actually paid the benefits, because the defendant effectively shifted the cost of the premium to its subcontractors by issuing change orders in the amount of each subcontractor's insurance costs. The plaintiffs further argued that § 31-291 requires a principal employer to demonstrate that it paid for "all or the entirety" of the workers' compensation benefits to an injured employee, and that the defendant had not done so.

The trial court granted the defendant's motion for summary judgment. In its memorandum of decision, the trial court first concluded that the plain and unambiguous meaning of the word "paid" as used in § 31-291 is "simply to transfer money." As such, because it was undisputed that the defendant had paid the premium, deductible, and other costs for the CCIP, the trial court concluded that no genuine issue of material fact existed as to whether the defendant "paid" workers' compensation benefits to Thompson and McVay. In essence, the trial court determined that the factual dispute about whether the subcontractors reimbursed the defendant for the costs of the CCIP through the change order process was not material to whether the defendant had paid the benefits. The trial court further concluded that § 31-291 does not require a principal employer to prove that it paid *all* of the workers' compensation benefits to an injured employee in order to obtain immunity. Accordingly, the trial court granted summary judgment in favor of the defendant on the plaintiffs' claims. This appeal followed.

On appeal, the plaintiffs claim that the trial court improperly interpreted the term "paid compensation benefits" in § 31-291, and that, under the proper construction, a genuine issue of material fact exists as to whether the defendant paid such benefits. The plaintiffs contend that the trial court adopted an unduly narrow

definition of the word "paid" as "simply to transfer money," and that the plain and unambiguous meaning of "paid" is to bear a cost. Alternatively, the plaintiffs argue that the word "paid" is ambiguous, and that the legislative history and purpose of § 31-291 supports their definition. The plaintiffs also reiterate their claim that the defendant was required to prove that it paid *all* of their benefits to obtain immunity under § 31-291. According to the plaintiffs, this interpretation of § 31-291 yields a genuine issue of material fact as to whether the defendant paid, namely, bore the entire cost of, the workers' compensation benefits provided to Thompson and McVay.

In response, the defendant contends that the trial court properly interpreted the term "paid compensation benefits" in § 31-291, but posits that, under either interpretation, it paid such benefits. The defendant argues that the trial court correctly determined that the plain and unambiguous meaning of "paid" is "simply to transfer money." Even under the plaintiffs' definition, however, the defendant argues that it "paid" workers' compensation benefits to Thompson and McVay because it bore the costs of the CCIP and did not pass those costs on to its subcontractors through the change order process. The defendant maintains that it simply eliminated the subcontractors' costs to provide their own insurance for the project, which they no longer incurred after enrolling in the CCIP. We conclude that, although § 31-291 requires a principal employer to bear the costs of all of the injured employees' benefits to be entitled to immunity, there nevertheless is no genuine issue of material fact as to whether the defendant bore all of those costs in this case.

"At the outset, we set forth the applicable standard of review. [T]he standard of review of a trial court's decision to grant a motion for summary judgment is well established. Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, 279 Conn. 207, 211, 901 A.2d 673 (2006). "The issue before this court involves a question of statutory interpretation that also requires our plenary review." (Internal quotation marks omitted.) Id., 212.

To determine whether the defendant "paid compensation benefits" to the plaintiffs, we must first discern the proper meaning of that term under § 31-291. Specifically, we first consider whether the word "paid" is properly defined, as urged by the plaintiffs, as to "bear a cost" or, as argued by the defendant, "simply to transfer

money." We next determine whether the term "paid compensation benefits" requires a principal employer to prove that it paid all of the injured employees' workers' compensation benefits to obtain statutory immunity under § 31-291.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citation omitted; internal quotation marks omitted.) *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, supra, 279 Conn. 212.

In accordance with § 1-2z, we begin our analysis with the text of the statute. Section 31-291 provides in relevant part: "When any principal employer procures any work to be done wholly or in part for him by a contractor, or through him by a subcontractor . . . such principal employer shall be liable to pay all compensation under this chapter to the same extent as if the work were done without the intervention of such contractor or subcontractor. The provisions of this section shall not extend immunity to any principal employer from a civil action brought by an injured employee . . . under the provisions of section 31-293 to recover damages resulting from personal injury . . . unless such principal employer has *paid compensation benefits* . . . to such injured employee . . . ." (Emphasis added.)

The first sentence of § 31-291 embodies the "principal employer doctrine," under which an employer that hires a contractor or subcontractor, and meets the statutory definition of a "principal employer,"[13] is liable to pay workers' compensation benefits to the injured employees of those contractors or subcontractors. *Pelletier* v. *Sordoni/Skanska Construction Co.*, 264 Conn. 509, 518–19, 825 A.2d 72 (2003). Furthermore, if the principal employer actually pays those benefits, according to the second sentence of § 31-291, it enjoys immunity from

further claims by the injured employees brought under § 31-293. The word "paid" is, however, not defined in § 31-291. Section 31-291 does specify, however, that the *principal employer* must have paid the benefits to the injured employee to obtain immunity, rather than merely stating in the abstract that the employee must *be paid* benefits, which appears to support the plaintiffs' definition of the word "paid" as a cost borne by the principal employer. In isolation, however, the plain language of § 31-291 provides no further insight into the meaning of this word.

We next examine the text of § 31-291 within the greater framework of the Workers' Compensation Act (act), General Statutes § 31-275 et seq. See *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, supra, 279 Conn. 212. The purpose of the act is "to provide compensation for injuries arising out of and in the course of employment, regardless of fault. . . . Under the statute, the employee surrenders his right to bring a common law action against the employer, thereby limiting the employer's liability to the statutory amount. . . . In return, the employee is compensated for his or her losses without having to prove liability." (Internal quotation marks omitted.) *Rettig* v. *Woodbridge*, 304 Conn. 462, 473, 41 A.3d 267 (2012); see also General Statutes § 31-284 (a).[14] The words "paid" and "pay" appear in relation to compensation in several sections of the act, but the act does not define those words.[15] See, e.g., General Statutes §§ 31-275 (I) (A) (iii), 31-293 (b) and 31-306 (b) ("paid"); General Statutes §§ 31-294c (b), 31-352 and 31-355 (b) ("pay").

In accordance with General Statutes § 1-1 (a), we, therefore, look to the common usage of the word "paid" to discern the definition intended by the legislature in § 31-291. See, e.g., *Potvin* v. *Lincoln Service & Equipment Co.*, 298 Conn. 620, 633, 6 A.3d 60 (2010). "To ascertain that usage, we look to the dictionary definition of the term." (Internal quotation marks omitted.) Id. Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) defines "pay" as "to make due return to for services rendered or property delivered," "to engage for money," or "to make a disposal or transfer of . . . money . . . ." Likewise, the American Heritage College Dictionary (4th Ed. 2007) defines "pay" as "to give . . . money . . . in exchange for goods or services" or "to bear a . . . cost . . . in recompense."[16]

We conclude that the term "paid compensation benefits," as used in § 31-291, is ambiguous. Given the fact that the dictionary definitions of "pay" include both "to make a disposal or transfer of . . . money"; Merriam-Webster's Collegiate Dictionary, supra; and "to bear a . . . cost"; American Heritage College Dictionary, supra; the definitions asserted by the plaintiffs and the defendant are reasonable.[17] Specifically, in the context of § 31-291, the legislature may reasonably have

intended that the principal employer advance workers' compensation benefits, allowing the principal employer to be reimbursed later by subcontractors or other involved parties. The legislature could also reasonably have intended, however, that the principal employer shoulder the financial burden of the benefits in exchange for immunity from further claims by the injured employees. When § 31-291 is read in the context of the act, the word "paid" is therefore susceptible to more than one reasonable interpretation. See *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, supra, 279 Conn. 212; see also, e.g., *Chase National Bank of New York* v. *Schleussner*, 117 Conn. 370, 167 A. 808 (1933) ("pay" primarily refers to "satisfaction made in money," but may also mean "to transfer").[18]

We therefore look to the legislative history of § 31-291 and the circumstances surrounding its enactment for further guidance. See, e.g., *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, supra, 279 Conn. 212. Moreover, in interpreting the language of § 31-291, "we do not write on a clean slate, but are bound by our previous judicial interpretations of the language and the purpose of the statute." *Kasica* v. *Columbia*, 309 Conn. 85, 93–94, 70 A.3d 1 (2013). We have previously stated that the purpose of the principal employer provision in § 31-291 is "to afford full protection to work[ers], by preventing the possibility of defeating the [act] by hiring irresponsible contractors or subcontractors to carry on a part of the [principal] employer's work." (Internal quotation marks omitted.) *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 264 Conn. 520.

The principal employer provision has been part of the act since its enactment in 1913. Id., 519. Prior to 1988, however, § 31-291 did not require the contractor to actually pay workers' compensation benefits to the injured employees in order to obtain immunity. Id., 521–22. So long as the employer was a principal employer— and, thus, was *liable* to pay the benefits—the employer enjoyed immunity from civil actions regardless of whether it *actually paid* those benefits. Id. This liability for benefits was "wholly theoretical," however. 31 H.R. Proc., Pt. 11, 1988 Sess., p. 3717, remarks of Representative Adamo. "Because of the certificates of insurance required of the subcontractors and . . . the benefits provided by the second injury fund[19] . . . the principal employer was rarely called upon actually to pay th[e] benefits." (Footnote added.) *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 264 Conn. 522. Principal employers therefore enjoyed an immunity from civil actions "for which they exchanged very little, if anything." Id.

In 1988, in recognition of this "inequitable situation"; 31 S. Proc., Pt. 8, 1988 Sess., p. 2703, remarks of Senator Spellman; the legislature amended § 31-291 to require principal employers to actually pay workers' compensa-

tion benefits in order to obtain the statutory immunity from civil actions. *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 264 Conn. 522–26. Legislators acknowledged that under the then current law, "the principal employer received an immunity for which [it] did not provide any benefit . . . ." 31 S. Proc., supra, p. 2704, remarks of Senator Spellman. As one representative put it, "[t]he problem . . . [was] that the principal employer [could receive] immunity from [an action] by an injured worker, even when that principal employer pa[id] that worker nothing at all." 31 H.R. Proc., supra, p. 3716, remarks of Representative Adamo. Likewise, one senator noted that "the situations in which [a] principal employer would ever be paying workers' compensation benefits became few and far between. Yet, they continued to enjoy the immunity." 31 S. Proc., supra, p. 2704, remarks of Senator Spellman. A legislators characterized this immunity as "false" and "foolish"; 31 H.R. Proc., supra, pp. 3741–46, remarks of Representative Adamo; and recognized that it created a "grossly unfair" and "particularly outrageous" situation. Id., pp. 3716–17, remarks of Representative Adamo. By adding the second sentence to § 31-291, the legislature sought to prevent principal employers from "get[ting] a free ride"; id., p. 3743, remarks of Representative Eugene Migliaro; and "hiding behind an immunity and not paying a single dime." Id., p. 3743, remarks of Representative Adamo. Thus, "[t]he purpose and effect of this amendment was to limit the implied common-law immunity of the principal employer to the situation in which it had *in fact* paid the workers' compensation benefits that presumably were the basis of its immunity. Implicit in this amendment, moreover, was the notion that, except in the *isolated cases* of its application, there would be *no such immunity*." (Emphasis added.) *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 525.

On the basis of this legislative history, we conclude that the legislature intended the word "paid" in § 31-291 to mean bear a cost, rather than simply transfer money. Legislators who supported adding this language to § 31-291 continually expressed concern with the lack of an even exchange for the principal employer's immunity from civil actions. It follows that, when the legislature stated that the principal employer must have "paid compensation benefits" to obtain immunity, it meant that the principal employer must shoulder the financial burden of those benefits, rather than pass that responsibility on to its subcontractors or the second injury fund. Otherwise, the "false" and "foolish" immunity that prompted the addition of this requirement to § 31-291 could continue. 31 H.R. Proc., supra, pp. 3741–46, remarks of Representative Adamo. Indeed, under the defendant's definition of the word "paid," principal employers could purchase workers' compensation insurance, seek direct reimbursement from their con-

tractors or subcontractors, and incur no cost at all in "exchange" for their immunity from claims by the injured employees of those contractors or subcontractors. *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 264 Conn. 522. This situation would, in reality, be no different from the "unbelievably unfair" situation that led to the 1988 amendment of § 31-291. 31 H.R. Proc., supra, p. 3717, remarks of Representative Adamo. Indeed, it would render that amendment superfluous, and we presume that the legislature does not intend to enact meaningless legislation. See, e.g., *In re Bachand*, 306 Conn. 37, 54, 49 A.3d 166 (2012).

This is not to say, however, that a principal employer cannot account for the cost of providing workers' compensation insurance through a CCIP for its contractors and subcontractors in its own bids for a project. We recognize that, ultimately, the owner of the project "bears the cost" for all of the workers' compensation insurance for the project. Indeed, a principal employer *must* pass these costs on to the owner in order to make a profit on the project.[20] We simply hold that a principal employer cannot pass these costs on to its contractors or subcontractors, or the second injury fund, and receive the statutory immunity under to § 31-291.

In the same vein, the legislative history of § 31-291 leads us to conclude further that the principal employer must pay all, not merely some, of the injured employees' workers' compensation benefits in order to receive the statutory immunity. Thus, we disagree with the trial court's interpretation to the contrary, which was based on the legislature's use of the word "all" in the first sentence of § 31-291, concerning the employer's liability to pay workers' compensation benefits, and not the second sentence, concerning the employer's immunity for paying such benefits. Although the absence of a word in a portion of a statute is surely significant in interpreting the statute; see *Viera* v. *Cohen*, 283 Conn. 412, 431, 927 A.2d 843 (2007) ("[t]ypically, the omission of a word otherwise used in the statutes suggests that the legislature intended a different meaning for the alternat[ive] term"); we cannot interpret § 31-291 in a manner that allows principal employers to pay only some benefits to receive immunity, because doing so would create a loophole in the statute that subverts the expressed intent of the legislature.[21] "The principles of statutory construction . . . require us to construe a statute in a manner that will not thwart its intended purpose or lead to absurd results." (Internal quotation marks omitted.) *Coppola* v. *Coppola*, 243 Conn. 657, 665, 707 A.2d 281 (1998). Under the trial court's interpretation of § 31-291, as advanced by the defendant, principal employers could pay a mere pittance of the injured employees' workers' compensation benefits and still obtain complete immunity from claims by those employees. Principal employers could also seek direct reimbursement from their contractors or subcontrac-

tors for nearly all of the cost of the benefits.[22] Like the "outrageous" situation that existed prior to 1988; 31 H.R. Proc., supra, p. 3717, remarks of Representative Adamo; principal employers would therefore exchange "very little" for their immunity. *Pelletier* v. *Sordoni/ Skanska Construction Co.*, supra, 264 Conn. 522. Such a construction of § 31-291 would also undermine the legislature's intent to limit the instances of principal employer immunity to "isolated" cases. Id., 525. Accordingly, we conclude that the term "paid compensation benefits" in § 31-291 requires a principal employer to demonstrate that it bore the cost of *all* of the workers' compensation benefits to an injured employee in order to obtain statutory immunity from civil actions.

Applying this construction of § 31-291 to the present case, we next determine whether there is a genuine issue of material fact with respect to whether the defendant paid, i.e. bore the cost of, *all* of the workers' compensation benefits to Thompson and McVay, thus entitling it to immunity under § 31-291. As noted previously, it is undisputed that the defendant paid the $1,150,465 premium for the workers' compensation coverage provided to United Anco, Instrument Sciences, and dozens of other subcontractors under the CCIP. It is also undisputed that the defendant paid a $250,000 deductible under the CCIP and a $17,500 claim handling fee to administer the benefits provided to Thompson and McVay. The plaintiffs argue, however, that the defendant recouped those costs from its subcontractors through the change order process. The plaintiffs claim that the defendant used change orders to carve its costs for the CCIP out of the subcontractors' contract prices, rather than adjusting the subcontractors' costs to reflect the fact that the CCIP relieved them of the responsibility to provide their own insurance. Thus, in the plaintiffs' view, the subcontractors actually "paid" workers' compensation benefits to Thompson and McVay, with the defendant serving as a mere intermediary. The defendant, however, responds that the change orders simply removed the costs that the subcontractors would have incurred to procure their own insurance, had a CCIP not been in place, from their subcontracts. The defendant contends that this price adjustment simply prevented it from "double-paying" for the subcontractors' insurance coverage. We agree with the defendant, and conclude that there is no genuine issue of material fact as to whether the defendant paid for all of the benefits provided to Thompson and McVay through the CCIP.

First, the defendant's standard subcontract and the manual demonstrate that the change orders eliminated the subcontractors' costs to procure their own insurance, rather than required the subcontractors to bear the costs of the CCIP. Both documents required the subcontractors to include a statement of their insurance costs in their bids. According to the manual, these costs represented the subcontractors' "*normal* cost[s] for the

insurance coverages . . . *provided under the CCIP*" as if "[the] CCIP insurance coverage was not provided . . . ." (Emphasis added.) Both documents also explain that if the defendant opted to implement a CCIP, those costs would be subtracted from each subcontract through appropriate change orders. Furthermore, in the event that the subcontractor's payroll increased, the subcontractor would issue a change order to the subcontract specifying its increased payroll, as well as its increased insurance costs to complete that work, had a CCIP not been in place. The manual specifically required the subcontractors to "price [these] [c]hange [o]rders to *include* their [i]nsurance [c]ost[s]." (Emphasis added.) Thereafter, according to the subcontract and manual, the defendant would issue its own changes orders to subtract those additional costs from the subcontract. See footnote 8 of this opinion. At the conclusion of the performance of the contract, an audit would be performed and the "insurance credit" to the defendant would be adjusted based upon actual payrolls incurred in the project and the final contract amount. This "credit" would reflect any change in the subcontractor's insurance costs throughout the project. If, conversely, the subcontractor overestimated its insurance costs, the *subcontractor* would be "credited accordingly."

The change orders themselves reflect this understanding of the change order process. United Anco's original bid to the defendant included an insurance cost of $69,877.68. The defendant subsequently issued a change order reducing United Anco's subcontract price by that exact amount. Additionally, after the defendant implemented the CCIP, Ducci Electrical asked Instrument Sciences to provide its normal insurance cost to complete its work, because Ducci Electrical's subcontract with the defendant "was negotiated prior to [the] CCIP."[23] Instrument Sciences provided an insurance cost of $19,945.95. Ducci Electrical then issued a change order to Instrument Sciences' subcontract in that exact amount. Later, when United Anco's payroll significantly increased, resulting in a new insurance cost of $1,156,604.04, the defendant issued additional change orders to deduct this exact amount from the corresponding increases in United Anco's subcontract.

The plaintiffs and the dissent have not established the existence of a genuine issue of material fact with respect to any relationship between the change orders to the subcontracts and the CCIP premium. The $1,150,465 CCIP insurance premium paid by the defendant encompassed workers' compensation coverage for dozens of subcontractors involved in the project, not just United Anco, Ducci Electrical, and Instrument Sciences. See footnote 5 of this opinion. The insurance rate to calculate this premium was $5.92 per $100 of payroll. This rate was used, in conjunction with the

aggregate payroll for all remaining work on the project by the defendant and its subcontractors, to calculate the CCIP premium. United Anco, however, used its own insurance rate of $10.93 per $100 of payroll to calculate its insurance costs. Similarly, Ducci Electrical and Instrument Sciences used their insurance rates of $5.38 and $8.97 per $100 of payroll, respectively, to calculate their costs. Thus, United Anco's and Instrument Sciences' insurance costs, as specified in their bids and reflected in their change orders, did not directly relate to the CCIP insurance premium.

Moreover, the manual and insurance policies also confirm that the defendant would pay the entire cost of the workers' compensation coverage provided to all subcontractors under the CCIP. The manual states that the defendant "provides" and "will furnish" workers' compensation insurance "for the benefit of all enrolled parties." The manual characterizes the defendant as the "[s]ponsor" of the program, and explicitly states that it "pays the cost of the CCIP insurance coverage." The CCIP enrollment application further states that the "[p]remiums for [the] program are the *responsibility of* [*the defendant*]." (Emphasis added.) Additionally, the insurance policies issued to the defendant, United Anco, and Instrument Sciences all describe the defendant as the "[s]ponsor" of the CCIP, and contain the following sentence: "This policy is issued at the direction of the [s]ponsor, who shall be *solely responsible* for payment of [the] premium."[24] (Emphasis added.)

Consistent with this documentary evidence, Daniel Cretella, the defendant's financial analyst, testified at his deposition that the change orders represented the subcontractors' costs to procure their own insurance for the project, had a CCIP not been in place, and not the costs of the CCIP. He testified that the change orders had "nothing to do with the cost of the CCIP" and instead represented "the particular subcontractor's cost to purchase insurance had they been purchasing insurance." He explained that the "payroll that [the subcontractors] were expending had a rate associated with [it]. That rate included the cost of insurance *had they been providing the insurance*. So the [change orders] carve out [those] insurance costs . . . because we are now providing that." (Emphasis added.) With respect to the defendant's subsequent change orders based on the subcontractors' increased payrolls, Cretella explained that the subcontractors "estimat[e] at the start of this process what their payroll is going to be that they expend. If their payroll exceeds that . . . then their cost of insurance . . . would have gone up. So, therefore, the subcontract *should have been reduced by that amount* . . . ." (Emphasis added.) Cretella further testified, "[w]e back out the insurance cost that . . . we were now purchasing based on their actual cost that *would have been included* in their bid . . . ." (Emphasis added.) Cretella also confirmed that the

defendant was "responsible for all premiums [and] all deductibles" under the policy, and that the defendant "pa[id] the premium 100 percent."[25] Neither the plaintiffs nor the dissent point to any evidence in the record disputing Cretella's financial analysis of the relationship between the subcontractors' insurance costs and the CCIP.[26]

The plaintiffs and the dissent argue, however, that several sections of the manual support their contention that the subcontractors actually paid the costs of the CCIP through the change order process.[27] They point to one section of the manual stating that the defendant "will, when due, *on behalf of the subcontractor*[s]," pay the "CCIP [i]nsurance [a]mount" to the relevant insurance company. (Emphasis added.) The plaintiffs also note the manual contains a section titled "identifying subcontractor insurance costs" as detailing "how [the] CCIP insurance amounts are *paid for*." (Emphasis added.) Lastly, the plaintiffs point to a provision of the manual stating that the subcontractors' insurance costs would be "taken against" their contracts.

We disagree with the plaintiffs' and dissent's argument that these sections of the manual raise a genuine issue of material fact as to whether the defendant bore the costs of the workers' compensation benefits provided to Thompson and McVay. The defendant did, in fact, pay the CCIP premium "on behalf of the subcontractor[s]," because the subcontractors received the benefit of workers' compensation coverage under the CCIP, rather than having to provide their own coverage. This language in the manual therefore does not suggest that the defendant served as a mere pass-through for the costs of the CCIP. Additionally, the section of the manual describing "how [the] CCIP insurance amounts are paid for" emphasizes that the defendant "pays the cost of the CCIP insurance coverage." Thus, this section of the manual does not necessarily indicate that the cost of the CCIP is calculated and paid for during the bidding and change order processes.[28] Furthermore, the manual's statement that the subcontractors' insurance costs would be "taken against" their contracts does not raise a genuine question of whether the subcontractors directly reimbursed the defendant for the costs of the CCIP. The defendant had no choice but to "take" these costs "against" its subcontracts in order to avoid double paying for the subcontractors' insurance coverage.[29] Otherwise, the defendant would have paid its subcontractors to provide their own insurance coverage *and* paid for the same coverage under the CCIP. Such "duplicative insurance coverage . . . would be contrary to our long-standing public policy against economic waste." *Misiti, LLC* v. *Travelers Property Casualty Co. of America*, 308 Conn. 146, 167–68 n.12, 61 A.3d 485 (2013); see also *DiLullo* v. *Joseph*, 259 Conn. 847, 854, 792 A.2d 819 (2002) ("[t]his duplication of insurance would, in our view, constitute economic waste"). We,

therefore, conclude that no genuine issue of material fact exists as to whether the defendant "paid compensation benefits" to Thompson and McVay under § 31-291. Accordingly, the trial court properly rendered summary judgment in favor of the defendant on the plaintiffs' claims.

The judgment is affirmed.

In this opinion PALMER, ZARELLA, ESPINOSA, VERTEFEUILLE and LAVINE, Js., concurred.

[1] General Statutes § 31-291 provides: "When any principal employer procures any work to be done wholly or in part for him by a contractor, or through him by a subcontractor, and the work so procured to be done is a part or process in the trade or business of such principal employer, and is performed in, on or about premises under his control, such principal employer shall be liable to pay all compensation under this chapter to the same extent as if the work were done without the intervention of such contractor or subcontractor. The provisions of this section shall not extend immunity to any principal employer from a civil action brought by an injured employee or his dependent under the provisions of section 31-293 to recover damages resulting from personal injury or wrongful death occurring on or after May 28, 1988, unless such principal employer has paid compensation benefits under this chapter to such injured employee or his dependent for the injury or death which is the subject of the action."

[2] We note that the present case was commenced on March 10, 2011, by the following plaintiffs: Elvira R. Gonzalez, James L. Thompson II, Carol M. Thompson, Robert Edwards, Dorry Edwards, Ned Remondi, Laurie Remondi, Salvatore Candelora, Debra Candelora, Wayne Bosquet, and Oluf Olsen. On September 23, 2013, the trial court issued an order realigning the parties in the present case pursuant to General Statutes § 52-108 and Practice Book § 9-19. Specifically, the trial court ordered the addition of James McVay as a plaintiff and the removal of all of the original plaintiffs with the exception of James L. Thompson II and Carol M. Thompson. In the interest of simplicity, we collectively refer to these three individuals as the plaintiffs.

We further note that the sole count of the operative complaint pertaining to Carol M. Thompson alleges loss of consortium, a claim that is derivative of the negligence and strict liability claims alleged by her husband, James L. Thompson II. See, e.g., *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 494, 408 A.2d 260 (1979). Unless otherwise noted, all references to Thompson hereinafter are to James L. Thompson II.

[3] The following additional parties have been named as defendants in the present case: Keystone Construction & Maintenance Services, Inc.; Kleen Energy Systems, LLC; Bluewater Energy Solutions, Inc.; Power Plant Management Services, LLC; WorleyParsons Group, Inc.; Spectra Energy Operating Company, LLC; and Siemens Energy, Inc. None of these additional defendants are, however, involved in the present appeal. In the interest of simplicity, all references to the defendant hereinafter are to O & G Industries, Inc.

[4] We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] As of February 7, 2010, the defendant's CCIP provided workers' compensation coverage for approximately eighty-five enrolled subcontractors.

[6] We note that, although the record does not appear to include the change order between the defendant and Ducci Electrical, the existence of that transaction is supported by the deposition testimony of Daniel Cretella, the defendant's financial analyst.

[7] The manual "[g]enerally describes the structure of the CCIP," "[i]dentifies responsibilities of the various parties involved in the [p]roject," "[p]rovides a basic description of CCIP coverage," "[d]escribes audit and administrative procedures," and "[p]rovides answers to basic questions about the CCIP." Daniel Cretella, the defendant's financial analyst, testified at his deposition in this case that the manual should have been provided to all enrolled subcontractors.

[8] The defendant's apparent purpose in monitoring the subcontractors' costs to procure their own insurance, after the CCIP was implemented, was to establish the "[v]erified [b]lended [p]ayroll [r]ate" for the CCIP. Additionally, the defendant "reserve[d] the right to terminate or modify the CCIP" at any time. In the event that the defendant terminated the CCIP, the manual stated that the defendant "may require the subcontractors to procure and maintain [alternative] insurance coverage." Thus, the defendant may have wished to monitor the subcontractors' normal insurance costs to

complete their work as necessary information in the event it decided to terminate the CCIP.

[9] Other than the defendant's first change order to United Anco's subcontract, which deducted the insurance costs specified in United Anco's original bid, only one other change order appears in the record on appeal. This change order, numbered sixteen, deducts $786,726 from United Anco's subcontract for its "[i]nsurance [p]remium." The order states that $1,156,604 represents United Anco's "total insurance premium cost," and that because $369,878 had already been deducted from the subcontract through previous change orders, an additional $786,726 would be deducted from the contract. Instrument Sciences' payrolls and insurance costs also apparently increased during the course of the project, but additional change orders between Ducci Electrical and Instrument Sciences are not contained within the record.

[10] The plaintiffs ask us to take judicial notice of several postjudgment filings in the present case concerning the cause of the explosion. The plaintiffs originally referenced these filings in their brief and included them in their appendix. We subsequently granted the defendant's motion to strike those filings from the record and the corresponding references in the brief. Accordingly, we decline to take judicial notice of these filings because they are irrelevant to the issue before this court. See *Drabik* v. *East Lyme*, 234 Conn. 390, 398, 662 A.2d 118 (1995) ("[j]udicial notice . . . meets the objective of establishing facts to which the offer of evidence would normally be directed" [internal quotation marks omitted]); cf. *State* v. *Gaines*, 257 Conn. 695, 705 and n.7, 778 A.2d 919 (2001) (taking judicial notice of transcript relevant to issue of whether defense attorney had conflict of interest); *Karp* v. *Urban Redevelopment Commission*, 162 Conn. 525, 527, 294 A.2d 633 (1972) (taking judicial notice of filing relevant to issue of whether trial court had jurisdiction over case).

[11] As of October 17, 2013, Thompson had received $104,035 in workers' compensation benefits paid by Old Republic, and McVay had received $6489 in benefits. Although Old Republic technically paid these benefits to Thompson and McVay, it did so in accordance with the workers' compensation insurance policies purchased by the defendant. In discussing the requirement that the principal employer "pa[y] [workers'] compensation benefits" to obtain immunity, the legislature did not appear to distinguish between benefits paid directly by the principal employer or by an insurance company pursuant to a policy purchased by the principal employer. When asked whether a principal employer that purchases workers' compensation insurance for its subcontractors would be immune from civil actions, one representative answered, "You're absolutely right . . . . If the principal employer or general contractor wanted to go out and buy workers' compensation insurance for [its] subcontractors' employees at the premiums they are today, so be it. I guess he could. And once he paid those benefits, yes, he would be immune because *he's in fact the person paying the workers' comp*[*ensation*] *benefits*." (Emphasis added.) 31 H.R. Proc., Pt. 11, 1988 Sess., p. 3729, remarks of Representative Adamo. Thus, it may be said that the defendant paid workers' compensation benefits to Thompson and McVay by purchasing workers' compensation insurance policies from Old Republic. See *Bishel* v. *Connecticut Yankee Atomic Power Co.*, 62 Conn. App. 537, 539–41, 771 A.2d 252 (granting summary judgment in favor of principal employer under § 31-291 when insurance company paid workers' compensation benefits to injured employees pursuant to owner controlled insurance program funded by principal employer), cert. denied, 256 Conn. 915, 773 A.2d 943 (2001).

[12] General Statutes § 31-293 (a) provides in relevant part: "When any injury for which compensation is payable under the provisions of this chapter has been sustained under circumstances creating in a person other than an employer who has complied with the requirements of subsection (b) of section 31-284, a legal liability to pay damages for the injury, the injured employee may claim compensation under the provisions of this chapter, but the payment or award of compensation shall not affect the claim or right of action of the injured employee against such person, but the injured employee may proceed at law against such person to recover damages for the injury . . . ."

We note that, although § 31-293 (a) was amended by our legislature after the commencement of the present case; see Public Acts 2011, No. 11-205, § 1; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[13] The three conditions that must exist for a contractor to qualify as a principal employer are: "(1) the relation of principal employer and contractor must exist in work wholly or in part for the former; (2) the work must be on or about premises controlled by the principal employer; [and] (3) the work must be a part or process in the trade or business of the principal

employer." (Internal quotation marks omitted.) *Gigliotti* v. *United Illuminating Co.*, 151 Conn. 114, 118, 193 A.2d 718 (1963).

[14] General Statutes § 31-284 (a) provides in relevant part: "An employer who complies with the requirements of subsection (b) of this section shall not be liable for any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment . . . but an employer shall secure compensation for his employees as provided under this chapter . . . ."

[15] Similarly, the general definitions statute, General Statutes § 1-1, also does not define the words "pay" or "paid."

[16] We note that the common usage of the word "pay" has not changed since the legislature enacted § 31-291, rendering reliance on current definitions instructive for the purpose of statutory interpretation. See *State* v. *Menditto*, 315 Conn. 861, 866, 110 A.3d 410 (2015) ("[b]ecause we seek to discern the intent of the legislature [at the time of enactment], dictionaries in print at that time are especially instructive"). Specifically, the Random House Dictionary (2d Ed. 1987) defines "pay" as "to give over (a certain amount of money) in exchange for something" and "to transfer money . . . as in making a purchase . . . ."

[17] The differences in the parties' proposed definitions may be illustrated with the following hypothetical example: A and B go to lunch and A pays for lunch with his credit card. Later, B reimburses A for his portion of the lunch in cash. Who has "paid" for B's lunch? Under the plaintiffs' definition, B has paid for his own lunch. Under the defendant's definition, A has paid for B's lunch, regardless of the fact that B later reimbursed A for the lunch.

[18] We note that similar ambiguities have been considered in other states. See *Everett* v. *State Farm Indemnity Co.*, 358 N.J. Super. 400, 407, 818 A.2d 372 (2002) (considering whether "payment of benefits" referred exclusively to monetary payment by insurance company to insured, or might also include credit against deductible or co-payment), aff'd, 175 N.J. 567, 818 A.2d 319 (2003); *Beaver* v. *Liston*, 76 Pa. Commw. 619, 623, 464 A.2d 679 (1983) (" '[p]ay' is a broad, general term lacking particular meaning and encompassing myriad forms of remuneration").

[19] Pursuant to General Statutes § 31-355, the second injury fund provides, inter alia, workers' compensation benefits to injured employees when their employers and their employers' insurers fail to pay such benefits. See, e.g., *Dechio* v. *Raymark Industries, Inc.*, 114 Conn. App. 58, 60, 968 A.2d 450 (2009) (discussing history and purpose of second injury fund), aff'd, 299 Conn. 376, 10 A.3d 20 (2010).

[20] Likewise, in the absence of a CCIP, subcontractors may include their costs to provide workers' compensation insurance for their employees in their bids to the general contractor, who would include such costs in its bid to the owner, and so on. Even though the general contractor and, ultimately, the owner of the project, "bear the cost" of such insurance, the subcontractor paid for the insurance in the first instance. As such, the subcontractor would be immune from claims by its own employees. The general contractor would not, however, enjoy such immunity. We agree with the trial court that "the common usage of the word 'paid' does not contemplate an accounting of debits and credits and an economic analysis as to which party has in fact incurred a permanent change in financial position as a result of a transaction."

[21] Indeed, we note that the trial court's interpretation of § 31-291 on this point conflicts with other Superior Court decisions on the subject. See, e.g., *Gall* v. *Smith*, Superior Court, judicial district of New Haven, Docket No. CV-99-0433624-S (May 21, 2002) (denying summary judgment in favor of principal employer on basis of immunity under § 31-291 because issue of fact existed as to whether employer "paid all of the workers' compensation benefits" to which deceased employee's estate and his dependents were entitled); *Barry* v. *Ninth Square Project*, Superior Court, judicial district of New Haven, Docket No. CV-96-0385898-S (March 26, 1999) (denying principal employer's motion for summary judgment pursuant to § 31-291 because, although employer submitted evidence showing "payment of a portion of the [workers'] compensation premium," employer "fail[ed] to demonstrate that [it] paid the entire workers' compensation premium").

[22] Moreover, if we were to hold that principal employers could pay only some of the injured employees' workers' compensation benefits to obtain immunity, it would be unclear at what point the principal employer had paid *enough* benefits to receive immunity. In the absence of specific legislative language to this effect, we cannot condone the adoption of such a seemingly unworkable standard by judicial act. See *Benvenuto* v. *Mahajan*, 245 Conn.

495, 501, 715 A.2d 743 (1998) ("it is more efficient, for the courts and the parties, to have a bright line rule because a case-by-case approach . . . . promotes, rather than eliminates, uncertainty" [internal quotation marks omitted]); see also *Durniak* v. *August Winter & Sons, Inc.*, 222 Conn. 775, 781, 610 A.2d 1277 (1992) ("We have repeatedly observed that our act represents a complex and comprehensive statutory scheme balancing the rights and claims of the employer and the employee arising out of work-related personal injuries. Because of the comprehensive nature of the act, the responsibility for carving out exceptions from any one of its provisions belongs to the legislature and not to the courts.").

[23] The manual states that the subcontractors are "solely responsible for recovering insurance costs" from subcontractors of lower tiers.

[24] The plaintiffs and the dissent argue that the fact that the defendant is not listed as an additional insured on the policies issued to United Anco and Instrument Sciences implies that the defendant did not bear the costs of the CCIP. Old Republic issued the defendant its *own* policy, however, and the defendant therefore had no need to be included on the policies issued to United Anco and Instrument Sciences. Moreover, what is important is that those policies listed the defendant as the *sponsor* of the CCIP, and clarified that the defendant shall be "solely responsible for payment of [the] premium."

[25] The following exchange also occurred between the plaintiffs' counsel and Cretella:

"Q. . . . I just want you to tell me if I understand the way the CCIP worked correctly; that is that [the defendant] paid an initial amount for the premium and . . . once a contractor or subcontractor would come within the CCIP, there would be a calculation . . . as to what that contractor or subcontractor's premium would be within the CCIP, and [the defendant] would bill the contractor or subcontractor for that premium? . . .

"A. No. I don't believe that's an accurate depiction at all. . . .

"Q. Did [the defendant] bill in any fashion United Anco for premiums for workers' [compensation]?

"A. No.

"Q. Did they use change orders to bill them?

"A. No.

"Q. Were there change orders associated with CCIP premiums?

"A. No. . . .

"Q. Did any of the contractors or subcontractors pay anything [toward] the CCIP premiums?

"A. No.

"Q. Did they ever reimburse [the defendant] anything for the CCIP premiums?

"A. No."

[26] We respectfully disagree with the plaintiffs' and dissent's contention that Cretella "admitted" that "the defendant did not provide the CCIP to the subcontractors for free." When asked directly whether the defendant provided workers' compensation insurance to its subcontractors for free, Cretella stated, "[w]e didn't *give* them anything, so no. We were *providing the insurance*." (Emphasis added.) Cretella then went on to clarify that the subcontractors gave no consideration in exchange for receiving the insurance coverage.

[27] The plaintiffs and the dissent also contend that the defendant profited from the CCIP, and argue that this fact supports their claim that the defendant "billed" its subcontractors for the costs of the CCIP. That the CCIP was economically advantageous for the defendant does not, however, affect the fact that it ultimately bore the costs of the CCIP. The defendant may have opted to implement the CCIP because it could provide workers' compensation insurance coverage at a lower cost than would be incurred were its subcontractors to be charged with providing such coverage. The manual required the subcontractors to include any profit and overhead that they typically charge on their insurance premiums in their bids to the defendant. United Anco included a 10 percent profit and overhead amount in its bid, and Ducci Electrical included a 16.3 percent profit and overhead amount in its bid. These amounts increased the subcontractors' insurance costs accordingly, and were incorporated into the costs later deducted from their contracts. In other words, the subcontractors' total insurance costs, including the profit and overhead amounts, were added and then deducted from their contracts. The fact that the defendant avoided having to pay the subcontractors a profit on their insurance premiums by implementing the CCIP does not change the fact that the defendant *did pay* the premium, deductible, and other costs for the CCIP.

[28] The plaintiffs and the dissent argue that, because Cretella testified that a section of the manual describing adjustments to the subcontractors' contracts for their insurance costs was "inaccurate," a genuine issue of material fact exists as to whether the defendant bore the costs of the CCIP. The

manual expressly states, however, that in the event that any provisions of the manual conflict with the CCIP insurance policies, the policies "shall govern." Consistent with this statement, Cretella explained that he did not seek to change the language of the manual because "[t]he manual is pretty clear that the policies govern. And to the extent that there's anything in [the manual] that's contradictory, defer to the policies. . . . The policies are pretty clear as to who owned [the] obligation to pay [the] premiums and deductibles." Indeed, as stated previously in this opinion, the CCIP insurance policies explicitly state that the defendant pays the costs of the CCIP.

[29] Cf. *Djeddar* v. *Rowley Spring & Stamping Corp.*, Superior Court, judicial district of New Britain, Docket No. CV-06-5001837-S (August 25, 2008) (denying summary judgment in favor of principal employer because "there was no evidence of any agreement between [the employer] and [the contractor] obligating [the contractor] to provide workers' compensation coverage . . . including no agreement that any part of [the employer]'s payment to [the contractor] would be used to purchase workers' compensation coverage"); *Geherty* v. *Connecticut Yankee Atomic Power Co.*, Superior Court, judicial district of Hartford, Docket No. CV-95-0546860-S (April 20, 1998) (denying summary judgment in favor of principal employer because employer failed to show that it was "primarily responsible for providing workers' compensation insurance to the [employee] . . . that [it] paid a separate fee to cover [the contractors'] expenses for such insurance, or that [it] or [its] insurance carrier paid such workers' compensation benefits" to employee).